UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

| | | |
|---|---|---|
| SUN, YUCHEN JUSTIN, | : | |
| | : | |
| *Plaintiff*, | : | Civil Action No. |
| | : | |
| -against- | : | |
| | : | |
| DAVID GEFFEN and ITHAKA TRUST, | : | |
| | : | |
| *Defendants*, | : | **COMPLAINT** |
| | : | |
| -and- | : | |
| | : | |
| *LE NEZ*, | : | |
| a sculpture, | : | |
| | : | |
| *Defendant-in-rem.* | : | |

------------------------------------------------------X

Plaintiff Sun Yuchen Justin ("Plaintiff"), by and through his undersigned counsel Pryor Cashman LLP, asserts claims for replevin, conversion and declaratory judgment against defendants David Geffen ("Geffen") and Ithaka Trust ("Ithaka"; together at times with Geffen, "Defendants"), and asserts in rem claims against the world to declare his ownership rights and clear title to *Le Nez* (The Nose), a sculpture by the artist Alberto Giacometti, and alleges and states as follows:

<u>**NATURE OF ACTION**</u>

1.      This is an action to recover an artwork by the renowned artist Alberto Giacometti entitled *Le Nez* (The Nose), which was stolen from its rightful owner, Plaintiff, and which is believed to be in the present possession of defendant Geffen in New York.

2.      *Le Nez* was stolen from Plaintiff by a former employee named Xiong Zihan Sydney ("Xiong").  Xiong has confessed to the crime.

3.      Xiong stole *Le Nez* by holding herself out as the representative of a Singapore-based entity known as APENFT Foundation Ltd. ("APENFT"), which she falsely identified as the owner of *Le Nez*, in a purported transaction with Defendants.

4.      APENFT is an entity owned by one of Plaintiff's relatives.  APENFT has never held title to *Le Nez*.

5.      In January 2024, Xiong forged Plaintiff's signature to purported deal documents on behalf of "APENFT," then arranged for the illicit transport of *Le Nez* to New York.

6.      To further her fraud and theft, Xiong fabricated that a Chinese lawyer named "Laura Chang" at the Yingke Law Firm in China represented Plaintiff and APENFT for purposes of the bogus transaction.

7.      No lawyer named "Laura Chang" (if she even exists) has ever represented Plaintiff or APENFT.  The Yingke Law Firm has never represented Plaintiff or APENFT.  Upon information and belief from the Yingke Law Firm, a lawyer with the same Chinese name as "Laura Chang" once worked there, but was fired back in 2020.

8.      Working with art dealers and a lawyer in the United States who apparently had a preexisting relationship with Defendants, Xiong caused *Le Nez* to be transferred to Defendants in exchange for two other artworks purportedly owned by Defendants and allegedly worth USD $55 million (collectively), plus an additional $10.5 million in cash, for a total sale price of $65.5 million for *Le Nez*.

9.      Plaintiff purchased *Le Nez* for more than $78 million in 2021, and, upon information and belief, its value has only risen, substantially so, since that time.

10.    In or about 2023, Plaintiff expressed an interest in selling *Le Nez* for a profit over his purchase price.  Plaintiff has never indicated any willingness to sell *Le Nez* for less than what he paid and in any form other than an all-cash (or equivalent) purchase.

11.    Defendants have wrongfully refused Plaintiff's demand for the return of *Le Nez*, indicating their intention to exploit the situation and to try to prove that – notwithstanding Xiong's blatant forgeries and fabrications to which she has *confessed*, as well as obvious red flags that Xiong was misrepresenting "APENFT's" ownership – Xiong somehow acted 'legitimately' and with Plaintiff's authorization in orchestrating "APENFT's" sale of *Le Nez* to Defendants.

12.    *Le Nez* was stolen.  Defendants either must restitute it or pay very substantial damages to Plaintiff.

## PARTIES

13.    Plaintiff is an individual who resides in Hong Kong, China.

14.    Upon information and belief, defendant Geffen is an individual who resides in New York, New York.  Upon information and belief, Geffen is one of the top and most sophisticated Modern and Contemporary art collectors in the world.

15.    Upon information and belief, defendant Ithaka Trust is a trust created under the laws of California, for which, upon further information and belief, Geffen is the sole trustee.

16.    Upon information and belief, defendant-in-rem *Le Nez* is a bronze, steel, and iron sculpture by renowned artist Alberto Giacometti, conceived in 1947-49 and cast in 1965.  The authenticity of this artwork has been confirmed by the Comité Giacometti and it is recorded in the Alberto Giacometti database as AGD 4329.  An image of *Le Nez* is below:



**JURISDICTION AND VENUE**

17.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a).

18.     In addition, this Court may exercise in rem and quasi in rem jurisdiction in this matter pursuant to 28 U.S.C. § 1655 because Plaintiff seeks in this suit to remove a cloud on the title of personal property located in New York, New York.

19.     This Court has jurisdiction to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, and 1655.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b). Venue is also proper in this District pursuant to 28 U.S.C. § 1655.

**FACTS**

**Plaintiff, Not APENFT, Has Owned *Le Nez* Since November 2021**

21.     On or about November 15, 2021, Plaintiff purchased *Le Nez* at auction from Sotheby's in New York, New York for a purchase price of USD $78,396,000.

22.     At all times since purchasing *Le Nez*, Plaintiff has owned it personally and solely.

23.    Plaintiff is a well-known cryptocurrency entrepreneur and the founder of the TRON blockchain, a leading global layer-1 blockchain.

24.    In or about 2021, Plaintiff was actively involved in the then-developing marketplace for non-fungible tokens ("NFTs"), and wanted to bring attention to and enhance that market.

25.    In that regard, Plaintiff advised APENFT, an online NFT marketplace and forum designed to bring public attention to NFTs and their various uses.

26.    One use for NFTs that was attracting considerable public interest at the time was the role that NFTs can play in connection with art.

27.    Among other things, APENFT offered (and continues to offer) a cyber-exhibition platform where works of art are virtually displayed on the blockchain.

28.    Nevertheless, upon information and belief and to Plaintiff's understanding, APENFT has never been an art collector or dealer and has never actually owned, bought or sold any physical art.

29.    While Plaintiff initially posted on social media that he planned to donate *Le Nez* to APENFT, he never actually donated or otherwise transferred it to APENFT, or to any other person or entity, deciding instead to allow *Le Nez* to be virtually exhibited by APENFT online.

**The Giacometti Fondation's Exhibition Of *Le Nez* In Paris In 2023**

30.    In or about 2023, Plaintiff was contacted by the Fondation Alberto et Annette Giacometti (the "Giacometti Fondation") with a request that he allow *Le Nez* to be publicly exhibited at Institut Giacometti in Paris, France.

31.    Plaintiff agreed and decided that he would also allow APENFT, which was virtually exhibiting *Le Nez*, to share sponsorship credit for the Giacometti Fondation exhibition.

32.    The Giacometti Fondation exhibited *Le Nez* at Institut Giacometti with an accompanying wall label stating that it was on "loan from the Justin Sun Collection" (*i.e.*, not from "APENFT").

33.    On or about October 10, 2023, Plaintiff posted on the social media outlet "X" that "'Le Nez,' part of my collection, is on display at Institut Giacometti."

34.    The exhibition of *Le Nez* in France was to occur between October 7, 2023 and January 14, 2024, after which *Le Nez* was to be returned to Plaintiff's storage facility in Singapore.

35.    Xiong, however, had hatched a scheme to steal *Le Nez* and sell it, with the intention of pocketing at least hundreds of thousands of dollars for herself.

**Xiong Lays The Groundwork To Steal *Le Nez* And Sell It To Geffen**

36.    Xiong formerly worked for Plaintiff with the title of a "Freelancer" who offered "professional skills" "to provide consulting services."

37.    Upon information and belief, Xiong was very interested in, and paid considerable attention to, news and happenings in the art market.

38.    Xiong was able to provide information to Plaintiff, and to serve as a liaison for certain commercial projects affiliated with Plaintiff, including those involving art.

39.    Plaintiff (unlike Geffen) is a relatively new collector of major art and is not as familiar with the Modern and Contemporary art market.

40.    Because Plaintiff is not familiar with the names of major international collectors and other art market participants who may be interested in buying or selling major art at any given time, he relied on Xiong, who appeared to him to have such background and information.

41.    While Xiong was an advisor to Plaintiff about art market information and a liaison for him to the art world, she was not a negotiator or business consultant for him or an attorney, and she had no authority to make deals for Plaintiff (involving art or other assets).

42.    Xiong was familiar with Plaintiff's efforts to enhance APENFT's brand, including in connection with the Giacometti Fondation exhibition of *Le Nez*.

43.    Xiong was also aware that Plaintiff had expressed interest in selling *Le Nez*.

44.    Xiong seized on that information to engineer her theft and fraud.

45.    In or about January 2024, Xiong told Plaintiff that, through her connections, she thought she might be able to find someone who would be interested in buying *Le Nez*.

46.    Even though Xiong was not an art dealer, and Plaintiff did not understand her to be one, Plaintiff did understand Xiong to have a broad network of connections, and he told her to let him know if she heard of anyone with interest who would pay over $80 million for *Le Nez*.

47.    Plaintiff did not give, and Xiong did not have, authority from Plaintiff to negotiate a deal with a potential buyer of *Le Nez*.  Xiong had authority only to make inquiries among her connections to see if she could identify a potential buyer with whom Plaintiff could negotiate.

48.    Xiong's connections apparently extended to Geffen, either directly or through intermediaries named David and Cole Tunkl, who, upon information and belief, are art dealers who work with Geffen.

**<u>Unbeknownst To Plaintiff, Xiong Negotiates With Defendants Under False Premises</u>**

49.    In January 2024, at the conclusion of the Giacometti Fondation exhibition, *Le Nez* did not return to Plaintiff's storage facility in Singapore.  Rather, unbeknownst to Plaintiff, Xiong, upon information and belief, had *Le Nez* transported from France to an art warehouse in Delaware under the control of the Tunkls.

50.    Xiong had no authority from Plaintiff to arrange such transfer of *Le Nez*.

51.    Also in January 2024, Xiong communicated by e-mail with the Tunkls and with a New York lawyer named Ralph Lerner ("Lerner"), who identified himself as a lawyer for the Tunkls, as "an attorney with great experience in the art world," and as a "facilitator" who could help arrange a deal for Geffen to acquire *Le Nez*.

52.    As Xiong communicated with Lerner, she introduced into the potential transaction "Laura Chang," who claimed to be a lawyer for the Yingke Law Firm in China and to represent Plaintiff and APENFT.

53.    "Chang," however, suspiciously corresponded through a "gmail.com" account instead of using a professional e-mail address.

54.    At this time Plaintiff does not know if "Laura Chang" is a real person, a real attorney, or a complete fabrication by Xiong.  No such lawyer has ever represented Plaintiff and, upon information and belief, no such lawyer has ever represented APENFT.  Nor, upon information and belief, did any such lawyer work for the Yingke Law Firm in 2024.

55.    Upon information and belief, Xiong created and personally operated the Gmail account that purportedly belonged to "Laura Chang."

56.    Xiong had no authority from Plaintiff to conduct any substantive negotiations with the Tunkls and Lerner, or to purport to paper a sale transaction for *Le Nez*.

57.    Lerner's statements show that Xiong and "Chang" had indicated to the Tunkls that any deal for *Le Nez* could not involve Plaintiff himself actually having to sign a contract.

58.    That condition, coupled with "Chang" communicating through a personal e-mail account, should have raised questions, but Lerner, the Tunkls and Geffen were not dissuaded from pursuing the transaction.

8

59.    Instead of questioning and properly documenting any relationship between Plaintiff and APENFT, Defendants structured the transaction documents to have "Chang" gloss over the issue of title.

60.    In particular, Lerner, the Tunkls and Geffen sought cover by telling "Chang" and Xiong that "Geffen wants [a] letter on your legal stationary saying you are legal counsel to Justin Sun, there are no liens on the Giacometti and that Justin Sun guarantees the representations and warranties made by APEN[F]T Foundation in a certain Exchange Agreement dated January ___ [sic], 2024; the letter would then be signed by both you and Mr. Sun."  Lerner stated that such a letter "might satisfy the Geffen group so Justin does not have to sign the Agreement."

**Xiong Manufactures Phony Documents To Satisfy The "Geffen Group"**

61.    Xiong set to work to provide such documentation to Geffen by deceiving Plaintiff into signing a different document she had prepared.  Specifically, on January 23, 2024, Xiong had Plaintiff sign a letter on behalf of himself addressed to Geffen, Ithaka and Lerner stating that *Le Nez* is free and clear of any liens (the "Good Title Letter").  APENFT was nowhere mentioned in the Good Title Letter.

62.    Xiong told Plaintiff that such a letter would be a useful first step towards a sale negotiation with a potential buyer.

63.    Xiong had been dropping a number of names of potentially interested buyers to Plaintiff, none of which had any significance to Plaintiff at the time, including the names of Geffen, Ithaka and Lerner.

64.    Upon information and belief, Xiong never shared the Good Title Letter with Defendants or Lerner.

65.    Instead, upon information and belief, Xiong copied Plaintiff's signature from the Good Title Letter and fraudulently affixed it as a supposed "acknowledgement" by Plaintiff to a phony "legal memorandum," also dated January 23, 2024, from "Chang" and the Yingke Law Firm that purported, fraudulently, to confirm that APENFT held good, clear and sole title to *Le Nez*.

66.    Upon information and belief, the "legal memorandum" was drafted by Lerner.

67.    Upon information and belief, and without Plaintiff's awareness, Xiong provided the bogus "legal memorandum" to the Tunkls to meet Geffen's demand for some written evidence of Plaintiff's approval and personal guarantee that "APENFT" could sell *Le Nez*.

68.    Coincident with the phony "legal memorandum," Xiong signed on behalf of "APENFT" a so-called "Exchange Agreement" dated January 23, 2024 between APENFT, as the purported owner and seller of *Le Nez*, on the one hand, and Defendants, as the purported buyers of *Le Nez*, on the other hand.

69.    Xiong fraudulently signed the "Exchange Agreement" as the purported "President" of APENFT.  Upon information and belief, Xiong was not the President or an employee of APENFT.

70.    According to the "Exchange Agreement," APENFT purportedly sold *Le Nez* to Defendants in exchange for two other artworks owned by Geffen (the "Geffen Artworks") at a combined, described fair market value of USD $55 million, with Defendants paying an additional USD $10.5 million in cash, for a total purported exchange and sale of *Le Nez* for only USD $65.5 million.

71.    Inconsistently, and oddly, the initial purported "Bill of Sale" for the transaction ("Exhibit D" to the "Exchange Agreement") was dated "January 23, 2024" and indicated that *Le*

*Nez* was "Sold by:  Apenft Foundation and Justin Sun" (which, on its face, should have cast further doubt on Xiong's ability to have been the sole person signing).

72.    Upon information and belief, Lerner subsequently changed "Exhibit D" to redact "Justin Sun" from the "Sold by" line (so that it only read "Apenft Foundation") and changed the date to "January 29, 2024," with the number "29" handwritten in, and asked Xiong to sign that version instead.

73.    The purported "Bill of Sale" by Geffen for the Geffen Artworks ("Exhibit C" to the "Exchange Agreement") also initially was dated "January 23, 2024" and identified "Apenft Art Foundation and Justin Sun" as the "Sold to" parties.  That, too, was later changed to a date of "January 29, 2024" (all typewritten) and to remove "Justin Sun" as a "Sold to" party.

74.    Plaintiff never knew about the "Exchange Agreement" or the "Bills of Sale" and did not authorize any such purported transaction.  Plaintiff never would have agreed to such a transaction had he been told about it – Plaintiff had expressed interest only in selling *Le Nez* for a profit over what he paid and in an all-cash (or equivalent) deal.

75.    Two months after the fraudulent "Exchange Agreement" was signed, Defendants suddenly amended the document to re-name Plaintiff as a selling party (together with APENFT).

76.    In connection with that change, Defendants prepared a purported "Authorization Agreement" that they told Xiong to have Plaintiff sign.

77.    There was no reason for Defendants to make these changes if they had no doubts about the veracity of what Xiong had told them, *i.e.*, that APENFT held sole, clear and good title to *Le Nez*.

78.     Defendants also amended their payment terms to have them pay the Tunkls' company (Ganymede International Inc.) instead of paying APENFT, with the Tunkls then transferring funds to Xiong *personally*.

79.     Upon information and belief, Defendants made these changes at Xiong's request because she realized that a direct payment to APENFT would have revealed her scheme. Xiong also did not have APENFT's fund transfer information.

80.     These payment term changes should have been obviously suspicious to Defendants.

81.     Defendants nonetheless pressed ahead with the amended 'deal.'

82.     Xiong copied or forged Plaintiff's signature to a purported, and equally fraudulent, "Authorization Agreement" dated March 23, 2024, by which Plaintiff purported to authorize the "Exchange Agreement" sale of *Le Nez*.

83.     None of this was true, and Plaintiff had no knowledge of it.

84.     Upon information and belief, *Le Nez* has been shipped to, and installed in, Geffen's residence in New York, New York, where, upon information and belief, it remains.

**Xiong's Confession Of Her Theft In December 2024**

85.     In or about May 2024, months after Xiong had already orchestrated her theft and fraud as described above, she informed Plaintiff that a purported buyer was considering purchasing *Le Nez*.

86.     Xiong identified the purported buyer to Plaintiff at the time as "David Martinez." Upon information and belief, there is a well known major art collector named David Martinez. Upon information and belief, however, that David Martinez had nothing to do with the events described above involving *Le Nez*.

87.    Xiong told Plaintiff that the purported buyer had provided $10 million as a good faith, refundable deposit to demonstrate his seriousness so that he could have more time to consider going ahead with a possible purchase.

88.    Xiong concealed from Plaintiff all of her activities between January–March 2024, as described above, and concealed from Plaintiff that a 'deal' for *Le Nez* with Defendants had already purported to close.

89.    Upon information and belief, as part of the "Exchange Agreement," the Tunkls were holding the Geffen Artworks.  Upon further information and belief, the Tunkls had transferred $10.5 million in cryptocurrency to Xiong's crypto wallet, from which Xiong kept $500,000 for herself and transferred $10 million to Plaintiff's crypto wallet.  The fact that Xiong was the owner of the wallet transferring $10 million to Plaintiff was not openly disclosed or known by Plaintiff at the time.

90.    Upon information and belief, the Tunkls had actually received $13 million from Defendants.

91.    Seven months passed without Plaintiff hearing whether the purported buyer had decided to make an offer for *Le Nez* or if he wanted his deposit back.  Plaintiff was unaware that Geffen was already living with *Le Nez* in his home.

92.    Plaintiff asked Xiong on December 18, 2024 if she knew what was happening with the purported buyer.

93.    Xiong's response was incoherent, and Plaintiff began to worry that something was amiss.

94.    Xiong identified the Tunkls to Plaintiff and claimed they were somehow responsible for the delay.

95.    Plaintiff told Xiong to put him in touch with the Tunkls (whom Plaintiff did not know and whose names, as well as the name of their company, Ganymede, had no significance to Plaintiff).

96.    Xiong did so by adding Plaintiff to a WhatsApp chat that she had been having with the Tunkls.

97.    On December 18, 2024, Plaintiff wrote into the chat (in imperfect English) that he was the owner of *Le Nez* and that he was canceling any deal negotiation due to the prolonged delay.

98.    Xiong apparently panicked at the realization that the Tunkls were likely to respond by revealing to Plaintiff the fraudulent "Exchange Agreement" and "Authorization Agreement," and, she quickly thereafter confessed her theft of *Le Nez* and fraud to Plaintiff, and revealed that *Le Nez* was now in the hands of Geffen.

99.    Upon hearing Xiong's confession, Plaintiff promptly deleted his December 18, 2024 chat message with the Tunkls out of concern that they might have been in on the theft, and decided that his counsel and the proper authorities should handle the matter.

100.    By letter dated December 23, 2024, Plaintiff (through counsel) wrote to Defendants (through their counsel) to explain Xiong's theft of *Le Nez*.

101.    After not hearing back, Plaintiff (through counsel) wrote again to Defendants (through their counsel) on January 24, 2025 and demanded that Defendants return *Le Nez* to him.

102.    Later on January 24, 2025, Defendants (through counsel) wrote back to Plaintiff (through counsel) and wrongfully refused Plaintiff's demand.

## FIRST CLAIM FOR RELIEF
### (REPLEVIN)

103.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

104.    Plaintiff is the rightful owner of *Le Nez*.

105.    Plaintiff is entitled to immediate possession of *Le Nez*.

106.    *Le Nez* was stolen from Plaintiff by Xiong.

107.    Defendants are wrongfully in possession and control of *Le Nez* and purport to hold title to *Le Nez*.

108.    Plaintiff has a superior right of possession to *Le Nez* relative to Defendants.

109.    Defendants have wrongfully refused Plaintiff's demand to return *Le Nez* to him.

110.    *Le Nez* is a unique and identifiable work of art.

111.    Plaintiff is entitled to his restitution of *Le Nez*.

112.    Plaintiff is entitled to appropriate statutory prejudgment interest.

## SECOND CLAIM FOR RELIEF
### (CONVERSION)

113.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

114.    Plaintiff is the rightful owner of *Le Nez*.

115.    Plaintiff is entitled to immediate possession of *Le Nez*.

116.    *Le Nez* was stolen from Plaintiff by Xiong.

117.    Defendants are wrongfully in possession and control of *Le Nez*.

118.    Plaintiff has a superior right of possession to *Le Nez* relative to Defendants.

119.    Defendants have wrongfully refused Plaintiff's demand to return *Le Nez* to him.

120.    Plaintiff is entitled to damages amounting to the lost value of *Le Nez* and consequential damages in amounts to be determined at trial, but believed to be in substantial excess of USD $80 million.

121.    Plaintiff is entitled to appropriate statutory prejudgment interest.

### THIRD CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201, 2202)

122.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

123.    Plaintiff is the rightful owner of *Le Nez*.

124.    Defendants wrongfully maintain that Plaintiff no longer owns *Le Nez* and that they (or either of them) are the rightful owners of *Le Nez*.

125.    There is a genuine dispute and an actual controversy and disagreement between Plaintiff and Defendants regarding ownership of *Le Nez*.

126.    Plaintiff is entitled to a declaratory judgment that he is the rightful owner of *Le Nez*.

### FOURTH CLAIM FOR RELIEF
### (ORDER QUIETING TITLE UNDER 28 U.S.C. § 1655)

127.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

128.    Plaintiff is the rightful owner of *Le Nez*.

129.    Defendants wrongfully maintain that Plaintiff no longer owns *Le Nez* and that they (or either of them) are the rightful owners of *Le Nez*.

130.    There is a genuine dispute and an actual controversy and disagreement between Plaintiff and Defendants regarding ownership of *Le Nez*.

131.    Plaintiff is entitled to an Order quieting title to *Le Nez* and declaring that Plaintiff,

vis-à-vis the rest of the world, is the rightful owner of *Le Nez*.

WHEREFORE, Plaintiff Sun Yuchen Justin respectfully prays for relief as follows:

i.    on his First Claim for Relief, an Order directing restitution of *Le Nez* to him, plus statutory prejudgment interest;

ii.    on his Second Claim for Relief, damages in an amount to be determined at trial but believed to be in substantial excess of USD $80 million, plus statutory prejudgment interest;

iii.    on his Third Claim for Relief, an Order declaring Plaintiff to be the rightful owner of *Le Nez*;

iv.    on his Fourth Claim for Relief, and Order quieting title to *Le Nez* and declaring Plaintiff as *Le Nez*'s rightful owner; and

v.    such other and further relief as the Court deems just and proper.

Dated: New York, New York
February 4, 2025

PRYOR CASHMAN LLP

By: _____
        William L. Charron
        wcharron@pryorcashman.com
        Paul Cossu
        pcossu@pryorcashman.com
        Maya Katalan
        mkatalan@pryorcashman.com
7 Times Square
New York, New York 10036
(212) 421-4100

*Attorneys for Plaintiff Sun Yuchen Justin*