**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SUN, YUCHEN JUSTIN,

      *Plaintiff and Counterclaim Defendant*,

  -against-

DAVID GEFFEN and ITHAKA TRUST,

      *Defendants and Counterclaim Plaintiffs*,

  -and-

*LE NEZ*,
   a sculpture,

      *Defendant-in-rem*.

Civil Action No. 1:25-cv-00995

**JURY TRIAL DEMANDED**

**DAVID GEFFEN AND ITHAKA TRUST'S ANSWER & COUNTERCLAIMS**

## TABLE OF CONTENTS

### ANSWER

GEFFEN'S ANSWER TO SUN'S ALLEGATIONS ................................................................. 1

GEFFEN'S AFFIRMATIVE DEFENSES ......................................................................... 44

### COUNTERCLAIMS

NATURE OF ACTION .......................................................................................... 48

PARTIES ........................................................................................................ 57

JURISDICTION AND VENUE ................................................................................. 57

FACTUAL BACKGROUND ..................................................................................... 58

I.   SUN CREATED APENFT AND USED IT TO HOLD HIS ART COLLECTION ........................ 58

    A.   Sun Created "Justnft," Later Renamed "Apenft" ........................................... 58

    B.   Apenft Was In The Business Of Buying And Selling Physical Works Of Art ........ 59

    C.   Sun Used Apenft To Hold His Art Collection—And To Profit From The Sale Of
         Its Token ............................................................................................... 59

    D.   Sun Continued To Control Apenft ................................................................ 62

II.  SUN AND APENFT EMPLOYED XIONG AS THEIR ART ADVISOR, CURATOR AND
     LIAISON TO THE ART WORLD .......................................................................... 63

    A.   Xiong Was An Art Advisor, Curator And Dealmaker ....................................... 63

    B.   Sun And Apenft Publicly Held Out Xiong As Apenft's Art Director And
         Curator, Responsible For Art Acquisitions ................................................... 64

    C.   Sun Publicly Held Out Xiong As His Personal Art Advisor And Liaison To The
         Art World—And Repeatedly Authorized Her To Enter Into Art Transactions On
         His Behalf ............................................................................................. 67

III. SUN ACQUIRED AND SUBSEQUENTLY DONATED LE NEZ .......................................... 70

    A.   Sun, Through Xiong, Purchased Le Nez ....................................................... 70

    B.   Immediately After Purchasing Le Nez, Sun Announced His Donation Of Le Nez
         To Apenft ............................................................................................. 71

IV.  STARTING IN 2023, THE GIACOMETTI FOUNDATION EXHIBITED LE NEZ—IN
     PARTNERSHIP WITH ITS OWNER, APENFT ......................................................... 72

    A.   Xiong Met Catherine Grenier, The Head of Giacometti Foundation, And
         Negotiated The Exhibition of Le Nez ......................................................... 72

    B.   Xiong Authorized The Transport Of Le Nez To Paris For The Giacometti
         Exhibition ............................................................................................. 72

C.    The Giacometti Foundation Promoted The *Le Nez* Exhibition As Being Done "In An Exceptional Partnership With APENFT Foundation"................................73

V.    **SUN DECIDED THAT APENFT SHOULD SELL *LE NEZ*—AND DIRECTED XIONG TO FIND A BUYER** ................................................................................................74

A.    After His Purchase And Donation of *Le Nez*, Sun's Net Worth Declined ............74

B.    Sun Authorized Xiong To Sell *Le Nez* And Other Works Of Art..........................75

C.    On Sun's/Apenft's Behalf, Xiong Used The Tunkls To Find A Buyer For *Le Nez* ................................................................................................................................75

D.    The Parties Entered Into The Exchange Transaction And The Sun Side Letter ....76

VI.    **AFTER THE TRANSACTION, SUN AND XIONG TRIED TO SELL THE TWO PAINTINGS— AND FAILED TO FIND A BUYER AT THE PRICES THEY WANTED** ................................79

A.    Sun And Xiong Spent Over One Year Trying To Sell The Two Paintings.............79

B.    Unable To Sell The Two Paintings On Their Desired Terms, Sun & Xiong Explored Fraudulent Means Of Reacquiring *Le Nez* ............................................80

C.    Sun Sent Multiple WhatsApp Messages Showing He Was Aware Of The Exchange Agreement And Then Deleted Them—And His Lawyers Are Now Trying To Rewrite Those Messages....................................................................81

VII.    **SUN AND XIONG CONCOCTED A FRAUDULENT SCHEME TO OBTAIN *LE NEZ*** ................84

A.    Sun Had A First Set Of Lawyers At Harder Stonerock Send A Demand Letter That Claimed That Xiong Forged Two Signatures On "23 March 2024" Due To "Time Pressure"—And Also Acknowledged That Xiong Had Told Sun About The "$10.5" Million ............................................................................................84

B.    Geffen Responded To The December Letter And Requested That Sun Answer Basic Questions And Produce Basic Documents....................................................88

C.    Sun's Fraudulent Scheme Is Consistent With A Broader Pattern Of Fraudulent Behavior....................................................................................................................91

D.    Geffen Is Entitled To Attorneys' Fees Pursuant To The Exchange Agreement ....93

**CAUSES OF ACTION**................................................................................................ 94

**DEMAND FOR JURY TRIAL**..................................................................................... 95

**PRAYER FOR RELIEF** .............................................................................................. 95

**LIST OF EXHIBITS**

| Ex. | Description |
|---|---|
| 1 | January 23, 2024 Letter Agreement Amending Exchange Agreement (the "Sun Side Letter") |
| 2 | December 18, 2024 Justin Sun WhatsApp Message (the "December 18 WhatsApp Message") |
| 3 | December 23, 2024 Letter from Harder Stonerock to Geffen's counsel (the "December Letter") |
| 4 | December 20, 2024 Statutory Declaration of Sydney Xiong (the "Xiong Declaration") |
| 5 | January 24, 2024 Letter from Nagy Wolfe Appleton to Sun (the "NWA Letter") |
| 6 | May 8, 2023 American Arbitration Association Order in *Hall, et al. v. Rainberry, Inc., et al.*, Case No. 012000108567 (the "Terminating Sanctions Order") |

Defendants and Counterclaim Plaintiffs David Geffen and Ithaka Trust (collectively, "Geffen"), by and through their undersigned counsel Nagy Wolfe Appleton LLP, hereby (i) answer the complaint (the "Complaint") filed by Plaintiff Sun Yuchen Justin ("Sun") and (ii) assert their counterclaims against Sun.  As shown below, Sun's claims concerning *Le Nez*, a sculpture by the artist Alberto Giacometti, are utterly without merit and constitute a bad-faith, tortious attempt to interfere with Geffen's ownership of *Le Nez*.  Geffen reproduces Sun's allegations below, sets forth his answers to each one, and then sets forth his counterclaims.

### GEFFEN'S ANSWER TO SUN'S ALLEGATIONS

### <u>Nature Of Action</u>

**Allegation:**

1.    This is an action to recover an artwork by the renowned artist Alberto Giacometti entitled *Le Nez* (The Nose), which was stolen from its rightful owner, Plaintiff, and which is believed to be in the present possession of defendant Geffen in New York.

**Answer:**

1.    Geffen admits that *Le Nez*, an artwork by Alberto Giacometti of which he is the rightful owner, is currently in his possession in New York.  Geffen denies the remaining allegations in Paragraph 1.


**Allegation:**

2.    *Le Nez* was stolen from Plaintiff by a former employee named Xiong Zihan Sydney ("Xiong").  Xiong has confessed to the crime.

**Answer:**

2.    Denied.

1

**Allegation:**

3.      Xiong stole *Le Nez* by holding herself out as the representative of a Singapore-based entity known as APENFT Foundation Ltd. ("APENFT"), which she falsely identified as the owner of Le Nez, in a purported transaction with Defendants.

**Answer:**

3.      Geffen admits that Xiong held herself out as, among other things, the representative of a Singapore-based entity known as APENFT Foundation Ltd. ("APENFT").  Otherwise, denied.

**Allegation:**

4.      APENFT is an entity owned by one of Plaintiff's relatives.  APENFT has never held title to Le Nez.

**Answer:**

4.      Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegation that APENFT is an entity owned by one of Plaintiff's relatives, and therefore denies that allegation.  Geffen denies the remaining allegations in Paragraph 4.

**Allegation:**

5.      In January 2024, Xiong forged Plaintiff's signature to purported deal documents on behalf of "APENFT," then arranged for the illicit transport of *Le Nez* to New York.

**Answer:**

5.      Denied.

**Allegation:**

6.      To further her fraud and theft, Xiong fabricated that a Chinese lawyer named "Laura Chang" at the Yingke Law Firm in China represented Plaintiff and APENFT for purposes of the bogus transaction.

**Answer:**

6.      Denied.


**Allegation:**

7.      No lawyer named "Laura Chang" (if she even exists) has ever represented Plaintiff or APENFT. The Yingke Law Firm has never represented Plaintiff or APENFT. Upon information and belief from the Yingke Law Firm, a lawyer with the same Chinese name as "Laura Chang" once worked there, but was fired back in 2020.

**Answer:**

7.      Denied.


**Allegation:**

8.      Working with art dealers and a lawyer in the United States who apparently had a preexisting relationship with Defendants, Xiong caused *Le Nez* to be transferred to Defendants in exchange for two other artworks purportedly owned by Defendants and allegedly worth USD $55 million (collectively), plus an additional $10.5 million in cash, for a total sale price of $65.5 million for *Le Nez*.

**Answer:**

8.      Geffen admits that Xiong—acting with both actual and apparent authority on behalf of both APENFT and Sun—caused *Le Nez* to be transferred to Defendants in exchange for two paintings and $10.5 million in cash.  Otherwise, denied.

**Allegation:**

9.      Plaintiff purchased *Le Nez* for more than $78 million in 2021, and, upon information and belief, its value has only risen, substantially so, since that time.

**Answer:**

9.      Geffen admits that Plaintiff purchased *Le Nez* for more than $78 million in 2021. Geffen lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 9 and therefore denies same.

**Allegation:**

10.      In or about 2023, Plaintiff expressed an interest in selling *Le Nez* for a profit over his purchase price. Plaintiff has never indicated any willingness to sell *Le Nez* for less than what he paid and in any form other than an all-cash (or equivalent) purchase.

**Answer:**

10.      Geffen admits that, in or about 2023, Plaintiff expressed an interest in seeing *Le Nez* sold.  Otherwise, denied.

**Allegation:**

11.     Defendants have wrongfully refused Plaintiff's demand for the return of *Le Nez*, indicating their intention to exploit the situation and to try to prove that – notwithstanding Xiong's blatant forgeries and fabrications to which she has *confessed*, as well as obvious red flags that Xiong was misrepresenting "APENFT's" ownership – Xiong somehow acted 'legitimately' and with Plaintiff's authorization in orchestrating "APENFT's" sale of *Le Nez* to Defendants.

**Answer:**

11.     Denied.

**Allegation:**

12.     *Le Nez* was stolen. Defendants either must restitute it or pay very substantial damages to Plaintiff.

**Answer:**

12.     Denied.

## Parties

**Allegation:**

13.     Plaintiff is an individual who resides in Hong Kong, China.

**Answer:**

13.     Geffen admits the allegations in Paragraph 13.

**Allegation:**

14. Upon information and belief, defendant Geffen is an individual who resides in New York, New York. Upon information and belief, Geffen is one of the top and most sophisticated Modern and Contemporary art collectors in the world.

**Answer:**

14. Geffen admits that he is an individual who is an art collector. Otherwise, denied.

**Allegation:**

15. Upon information and belief, defendant Ithaka Trust is a trust created under the laws of California, for which, upon further information and belief, Geffen is the sole trustee.

**Answer:**

15. Geffen admits the allegations in Paragraph 15.

**Allegation:**

16. Upon information and belief, defendant-in-rem *Le Nez* is a bronze, steel, and iron sculpture by renowned artist Alberto Giacometti, conceived in 1947-49 and cast in 1965. The authenticity of this artwork has been confirmed by the Comité Giacometti and it is recorded in the Alberto Giacometti database as AGD 4329. An image of *Le Nez* is below:



**Answer:**

    16.    Geffen admits the allegations in Paragraph 16.

## Jurisdiction and Venue

**Allegation:**

    17.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a).

**Answer:**

    17.    Geffen admits the allegations in Paragraph 17.

**Allegation:**

    18.    In addition, this Court may exercise in rem and quasi in rem jurisdiction in this matter pursuant to 28 U.S.C. § 1655 because Plaintiff seeks in this suit to remove a cloud on the title of personal property located in New York, New York.

**Answer:**

18.    The allegations contained in Paragraph 18 constitute a legal conclusion as to which no responsive pleading is required.

**Allegation:**

19.    This Court has jurisdiction to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, and 1655.

**Answer:**

19.    Geffen admits that this Court has jurisdiction to grant declaratory relief in this action.

**Allegation:**

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b). Venue is also proper in this District pursuant to 28 U.S.C. § 1655.

**Answer:**

20.    Geffen admits that venue is proper.

<u>**Facts**</u>

<u>**Plaintiff, Not APENFT, Has Owned *Le Nez* Since November 2021**</u>

**Allegation:**

21.    On or about November 15, 2021, Plaintiff purchased *Le Nez* at auction from Sotheby's in New York, New York for a purchase price of USD $78,396,000.

**Answer:**

21.    Geffen admits the allegations in Paragraph 21.

**Allegation:**

22.    At all times since purchasing *Le Nez*, Plaintiff has owned it personally and solely.

**Answer:**

22.    Denied.

**Allegation:**

23.    Plaintiff is a well-known cryptocurrency entrepreneur and the founder of the TRON blockchain, a leading global layer-1 blockchain.

**Answer:**

23.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and therefore denies the allegations.

**Allegation:**

24.    In or about 2021, Plaintiff was actively involved in the then-developing marketplace for non-fungible tokens ("NFTs"), and wanted to bring attention to and enhance that market.

**Answer:**

24.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 and therefore denies the allegations.

**Allegation:**

25.     In that regard, Plaintiff advised APENFT, an online NFT marketplace and forum designed to bring public attention to NFTs and their various uses.

**Answer:**

25.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and therefore denies the allegations.

**Allegation:**

26.     One use for NFTs that was attracting considerable public interest at the time was the role that NFTs can play in connection with art.

**Answer:**

26.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 and therefore denies the allegations.

**Allegation:**

27.     Among other things, APENFT offered (and continues to offer) a cyber-exhibition platform where works of art are virtually displayed on the blockchain.

**Answer:**

27.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27 and therefore denies the allegations.

**Allegation:**

28.     Nevertheless, upon information and belief and to Plaintiff's understanding, APENFT has never been an art collector or dealer and has never actually owned, bought or sold any physical art.

**Answer:**

28.     Denied.


**Allegation:**

29.     While Plaintiff initially posted on social media that he planned to donate *Le Nez* to APENFT, he never actually donated or otherwise transferred it to APENFT, or to any other person or entity, deciding instead to allow *Le Nez* to be virtually exhibited by APENFT online.

**Answer:**

29.     Geffen admits that Plaintiff announced on social media that he would donate *Le Nez* to APENFT.  Otherwise, denied.


**The Giacometti Fondation's Exhibition Of *Le Nez* In Paris In 2023**

**Allegation:**

30.     In or about 2023, Plaintiff was contacted by the Fondation Alberto et Annette Giacometti (the "Giacometti Fondation") with a request that he allow *Le Nez* to be publicly exhibited at Institut Giacometti in Paris, France.

**Answer:**

30.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30 and therefore denies the allegations.

**Allegation:**

31.     Plaintiff agreed and decided that he would also allow APENFT, which was virtually exhibiting *Le Nez*, to share sponsorship credit for the Giacometti Fondation exhibition.

**Answer:**

31.     Geffen admits that APENFT was given sponsorship credit in connection with the Giacometti Foundation exhibition.  Geffen denies that Plaintiff was given or in any way "share[d]" any such sponsorship credit with APENFT.  Geffen denies the remaining allegations in Paragraph 31.

**Allegation:**

32.     The Giacometti Fondation exhibited *Le Nez* at Institut Giacometti with an accompanying wall label stating that it was on "loan from the Justin Sun Collection" (*i.e.*, not from "APENFT").

**Answer:**

32.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 and therefore denies the allegations.

**Allegation:**

33.     On or about October 10, 2023, Plaintiff posted on the social media outlet "X" that "'Le Nez,' part of my collection, is on display at Institut Giacometti."

**Answer:**

33.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33 and therefore denies the allegations.

**Allegation:**

34.    The exhibition of *Le Nez* in France was to occur between October 7, 2023 and January 14, 2024, after which *Le Nez* was to be returned to Plaintiff's storage facility in Singapore.

**Answer:**

34.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 34 and therefore denies the allegations.

**Allegation:**

35.    Xiong, however, had hatched a scheme to steal *Le Nez* and sell it, with the intention of pocketing at least hundreds of thousands of dollars for herself.

**Answer:**

35.    Denied.

**Xiong Lays The Groundwork To Steal *Le Nez* And Sell It To Geffen**

**Allegation:**

36.    Xiong formerly worked for Plaintiff with the title of a "Freelancer" who offered "professional skills" "to provide consulting services."

**Answer:**

36.    Geffen admits that Xiong worked for Plaintiff.  Otherwise, the allegation in Paragraph 36 appears to be quoting a document that Plaintiff has not produced to Geffen and, accordingly, Geffen lacks information sufficient to admit or deny the remainder of this allegation, and denies same.

**Allegation:**

37.    Upon information and belief, Xiong was very interested in, and paid considerable attention to, news and happenings in the art market.

**Answer:**

37.    Geffen admits the allegations in Paragraph 37.

**Allegation:**

38.    Xiong was able to provide information to Plaintiff, and to serve as a liaison for certain commercial projects affiliated with Plaintiff, including those involving art.

**Answer:**

38.    Geffen admits the allegations in Paragraph 38.

**Allegation:**

39.    Plaintiff (unlike Geffen) is a relatively new collector of major art and is not as familiar with the Modern and Contemporary art market.

**Answer:**

39.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39 and therefore denies the allegations.

**Allegation:**

40.    Because Plaintiff is not familiar with the names of major international collectors and other art market participants who may be interested in buying or selling major art at any given time, he relied on Xiong, who appeared to him to have such background and information.

**Answer:**

40.    Geffen admits that Plaintiff relied on Xiong for the buying and selling of major art. Geffen otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 40 and therefore denies the allegations.

**Allegation:**

41.    While Xiong was an advisor to Plaintiff about art market information and a liaison for him to the art world, she was not a negotiator or business consultant for him or an attorney, and she had no authority to make deals for Plaintiff (involving art or other assets).

**Answer:**

41.    Geffen admits that Xiong was an advisor to Plaintiff about art market information and a liaison for him to the art world.  Otherwise, denied.

**Allegation:**

42.     Xiong was familiar with Plaintiff's efforts to enhance APENFT's brand, including in connection with the Giacometti Fondation exhibition of *Le Nez*.

**Answer:**

42.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42 and therefore denies the allegations.

**Allegation:**

43.     Xiong was also aware that Plaintiff had expressed interest in selling *Le Nez*.

**Answer:**

43.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 and therefore denies the allegations.

**Allegation:**

44.     Xiong seized on that information to engineer her theft and fraud.

**Answer:**

44.     Denied.

**Allegation:**

45.     In or about January 2024, Xiong told Plaintiff that, through her connections, she thought she might be able to find someone who would be interested in buying *Le Nez*.

**Answer:**

45.     Geffen admits that Xiong helped Plaintiff and APENFT find a buyer for *Le Nez* and that she communicated with Plaintiff about her doing so.  Geffen lacks information sufficient to admit or deny the remainder of the allegations in Paragraph 45 and therefore denies the allegations.

**Allegation:**

46.     Even though Xiong was not an art dealer, and Plaintiff did not understand her to be one, Plaintiff did understand Xiong to have a broad network of connections, and he told her to let him know if she heard of anyone with interest who would pay over $80 million for *Le Nez*.

**Answer:**

46.     Geffen admits that Xiong helped Plaintiff and Apenft find a buyer for *Le Nez* and that she communicated with Plaintiff about her doing so.  Otherwise, denied.

**Allegation:**

47.     Plaintiff did not give, and Xiong did not have, authority from Plaintiff to negotiate a deal with a potential buyer of *Le Nez*. Xiong had authority only to make inquiries among her connections to see if she could identify a potential buyer with whom Plaintiff could negotiate.

**Answer:**

47.     Denied.

**Allegation:**

48.    Xiong's connections apparently extended to Geffen, either directly or through intermediaries named David and Cole Tunkl, who, upon information and belief, are art dealers who work with Geffen.

**Answer:**

48.    Geffen admits that David and Cole Tunkl are art dealers, that he has worked with them in the past, and that Xiong's connections included the Tunkls.  Otherwise, denied.


**Unbeknownst To Plaintiff, Xiong Negotiates With Defendants Under False Premises**

**Allegation:**

49.    In January 2024, at the conclusion of the Giacometti Fondation exhibition, *Le Nez* did not return to Plaintiff's storage facility in Singapore. Rather, unbeknownst to Plaintiff, Xiong, upon information and belief, had *Le Nez* transported from France to an art warehouse in Delaware under the control of the Tunkls.

**Answer:**

49.    Geffen admits that, at some point following the Giacometti Fondation exhibition, *Le Nez* was transported to the United States.  Geffen denies that this transport was done without Plaintiff's knowledge.  Geffen otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49 and therefore denies the allegations.


**Allegation:**

50.    Xiong had no authority from Plaintiff to arrange such transfer of *Le Nez*.

**Answer:**

    50.    Denied.

**Allegation:**

    51.    Also in January 2024, Xiong communicated by e-mail with the Tunkls and with a New York lawyer named Ralph Lerner ("Lerner"), who identified himself as a lawyer for the Tunkls, as "an attorney with great experience in the art world," and as a "facilitator" who could help arrange a deal for Geffen to acquire *Le Nez*.

**Answer:**

    51.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51 and therefore denies the allegations.

**Allegation:**

    52.    As Xiong communicated with Lerner, she introduced into the potential transaction "Laura Chang," who claimed to be a lawyer for the Yingke Law Firm in China and to represent Plaintiff and APENFT.

**Answer:**

    52.    Geffen admits the allegations in Paragraph 52.

**Allegation:**

    53.    "Chang," however, suspiciously corresponded through a "gmail.com" account instead of using a professional e-mail address.

**Answer:**

53.     Geffen denies that correspondence through Gmail accounts is suspicious.  Geffen otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 and therefore denies the allegations.

**Allegation:**

54.     At this time Plaintiff does not know if "Laura Chang" is a real person, a real attorney, or a complete fabrication by Xiong. No such lawyer has ever represented Plaintiff and, upon information and belief, no such lawyer has ever represented APENFT. Nor, upon information and belief, did any such lawyer work for the Yingke Law Firm in 2024.

**Answer:**

54.     Denied.

**Allegation:**

55.     Upon information and belief, Xiong created and personally operated the Gmail account that purportedly belonged to "Laura Chang."

**Answer:**

55.     Denied.

**Allegation:**

56.     Xiong had no authority from Plaintiff to conduct any substantive negotiations with the Tunkls and Lerner, or to purport to paper a sale transaction for *Le Nez*.

**Answer:**

56.    Denied.

**Allegation:**

57.    Lerner's statements show that Xiong and "Chang" had indicated to the Tunkls that any deal for *Le Nez* could not involve Plaintiff himself actually having to sign a contract.

**Answer:**

57.    Geffen admits that Xiong and Chang indicated that Plaintiff preferred not to have to personally sign a contract, although he was willing to sign—and ultimately did sign—a letter agreement containing, among other things, representations and warranties about *Le Nez*. Otherwise, denied.

**Allegation:**

58.    That condition, coupled with "Chang" communicating through a personal e-mail account, should have raised questions, but Lerner, the Tunkls and Geffen were not dissuaded from pursuing the transaction.

**Answer:**

58.    Denied.

**Allegation:**

59.    Instead of questioning and properly documenting any relationship between Plaintiff and APENFT, Defendants structured the transaction documents to have "Chang" gloss over the issue of title.

**Answer:**

59.    Denied.

**Allegation:**

60.    In particular, Lerner, the Tunkls and Geffen sought cover by telling "Chang" and Xiong that "Geffen wants [a] letter on your legal stationary saying you are legal counsel to Justin Sun, there are no liens on the Giacometti and that Justin Sun guarantees the representations and warranties made by APEN[F]T Foundation in a certain Exchange Agreement dated January ___ [sic], 2024; the letter would then be signed by both you and Sun." Lerner stated that such a letter "might satisfy the Geffen group so Justin does not have to sign the Agreement."

**Answer:**

60.    Geffen admits that Mr. Lerner wrote the language contained within quotation marks in Paragraph 60. Otherwise, denied.

## Xiong Manufactures Phony Documents To Satisfy The "Geffen Group"

**Allegation:**

61.    Xiong set to work to provide such documentation to Geffen by deceiving Plaintiff into signing a different document she had prepared. Specifically, on January 23, 2024, Xiong had Plaintiff sign a letter on behalf of himself addressed to Geffen, Ithaka and Lerner stating that *Le Nez* is free and clear of any liens (the "Good Title Letter"). APENFT was nowhere mentioned in the Good Title Letter.

**Answer:**

61.      Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61 and therefore denies the allegations.

**Allegation:**

62.      Xiong told Plaintiff that such a letter would be a useful first step towards a sale negotiation with a potential buyer.

**Answer:**

62.      Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62 and therefore denies the allegations.

**Allegation:**

63.      Xiong had been dropping a number of names of potentially interested buyers to Plaintiff, none of which had any significance to Plaintiff at the time, including the names of Geffen, Ithaka and Lerner.

**Answer:**

63.      Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63 and therefore denies the allegations.

**Allegation:**

64.      Upon information and belief, Xiong never shared the Good Title Letter with Defendants or Lerner.

**Answer:**

64.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the existence of any such "Good Title Letter" but admits that, to the extent any such letter actually exists, he has not seen it.  Geffen otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 64 and therefore denies the allegations.

**Allegation:**

65.    Instead, upon information and belief, Xiong copied Plaintiff's signature from the Good Title Letter and fraudulently affixed it as a supposed "acknowledgement" by Plaintiff to a phony "legal memorandum," also dated January 23, 2024, from "Chang" and the Yingke Law Firm that purported, fraudulently, to confirm that APENFT held good, clear and sole title to *Le Nez*.

**Answer:**

65.    Denied.

**Allegation:**

66.    Upon information and belief, the "legal memorandum" was drafted by Lerner.

**Answer:**

66.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 66 and therefore denies the allegations.

**Allegation:**

67.    Upon information and belief, and without Plaintiff's awareness, Xiong provided the bogus "legal memorandum" to the Tunkls to meet Geffen's demand for some written evidence of Plaintiff's approval and personal guarantee that "APENFT" could sell *Le Nez*.

**Answer:**

67.    Geffen admits that the referenced "legal memorandum" in Paragraph 67 exists. Geffen also admits that, through his counsel, he requested that Plaintiff represent and warrant that APENFT could sell *Le Nez*, which Plaintiff did.  Otherwise, denied.

**Allegation:**

68.    Coincident with the phony "legal memorandum," Xiong signed on behalf of "APENFT" a so-called "Exchange Agreement" dated January 23, 2024 between APENFT, as the purported owner and seller of *Le Nez*, on the one hand, and Defendants, as the purported buyers of *Le Nez*, on the other hand.

**Answer:**

68.    Geffen admits that Xiong signed on behalf of Apenft the Exchange Agreement dated January 23, 2024, and that the Exchange Agreement was between Apenft, on the one hand, and Defendants, on the other hand.  Otherwise, denied.

**Allegation:**

69.    Xiong fraudulently signed the "Exchange Agreement" as the purported "President" of APENFT. Upon information and belief, Xiong was not the President or an employee of APENFT.

**Answer:**

69.     Geffen admits that Xiong signed the Exchange Agreement and that the Exchange Agreement notes the word "President" in proximity to Xiong's name.  Otherwise, denied.


**Allegation:**

70.     According to the "Exchange Agreement," APENFT purportedly sold *Le Nez* to Defendants in exchange for two other artworks owned by Geffen (the "Geffen Artworks") at a combined, described fair market value of USD $55 million, with Defendants paying an additional USD $10.5 million in cash, for a total purported exchange and sale of *Le Nez* for only USD $65.5 million.

**Answer:**

70.     Geffen admits that the Exchange Agreement called for Apenft to convey *Le Nez* to Geffen.  Geffen further admits that the Exchange Agreement called for Geffen to convey two artworks he owned to Apenft.  Geffen further admits that the Exchange Agreement called for Geffen to transmit USD $10.5 million Apenft.  Otherwise, denied.


**Allegation:**

71.     Inconsistently, and oddly, the initial purported "Bill of Sale" for the transaction ("Exhibit D" to the "Exchange Agreement") was dated "January 23, 2024" and indicated that *Le Nez* was "Sold by: Apenft Foundation and Justin Sun" (which, on its face, should have cast further doubt on Xiong's ability to have been the sole person signing).

**Answer:**

71.     Denied.

**Allegation:**

72.    Upon information and belief, Lerner subsequently changed "Exhibit D" to redact "Justin Sun" from the "Sold by" line (so that it only read "Apenft Foundation") and changed the date to "January 29, 2024," with the number "29" handwritten in, and asked Xiong to sign that version instead.

**Answer:**

72.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72 and therefore denies the allegations.

**Allegation:**

73.    The purported "Bill of Sale" by Geffen for the Geffen Artworks ("Exhibit C" to the "Exchange Agreement") also initially was dated "January 23, 2024" and identified "Apenft Art Foundation and Justin Sun" as the "Sold to" parties. That, too, was later changed to a date of "January 29, 2024" (all typewritten) and to remove "Justin Sun" as a "Sold to" party.

**Answer:**

73.    Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73 and therefore denies the allegations.

**Allegation:**

74.    Plaintiff never knew about the "Exchange Agreement" or the "Bills of Sale" and did not authorize any such purported transaction. Plaintiff never would have agreed to such a

transaction had he been told about it – Plaintiff had expressed interest only in selling *Le Nez* for a profit over what he paid and in an all-cash (or equivalent) deal.

**Answer:**

74.    Denied.

**Allegation:**

75.    Two months after the fraudulent "Exchange Agreement" was signed, Defendants suddenly amended the document to re-name Plaintiff as a selling party (together with APENFT).

**Answer:**

75.    Geffen admits that there was an amendment to the Exchange Agreement subsequent to the Exchange Agreement's effective date.  Otherwise, denied.

**Allegation:**

76.    In connection with that change, Defendants prepared a purported "Authorization Agreement" that they told Xiong to have Plaintiff sign.

**Answer:**

76.    Denied.

**Allegation:**

77.    There was no reason for Defendants to make these changes if they had no doubts about the veracity of what Xiong had told them, *i.e.*, that APENFT held sole, clear and good title to *Le Nez*.

**Answer:**

77.    Denied.

**Allegation:**

78.    Defendants also amended their payment terms to have them pay the Tunkls' company (Ganymede International Inc.) instead of paying APENFT, with the Tunkls then transferring funds to Xiong *personally*.

**Answer:**

78.    Denied.

**Allegation:**

79.    Upon information and belief, Defendants made these changes at Xiong's request because she realized that a direct payment to APENFT would have revealed her scheme. Xiong also did not have APENFT's fund transfer information.

**Answer:**

79.    Denied.

**Allegation:**

80.    These payment term changes should have been obviously suspicious to Defendants.

**Answer:**

80.    Denied.

**Allegation:**

81.      Defendants nonetheless pressed ahead with the amended 'deal.'

**Answer:**

81.      Geffen admits that the Exchange Agreement was amended.  Otherwise, denied.


**Allegation:**

82.      Xiong copied or forged Plaintiff's signature to a purported, and equally fraudulent, "Authorization Agreement" dated March 23, 2024, by which Plaintiff purported to authorize the "Exchange Agreement" sale of *Le Nez*.

**Answer:**

82.      Denied.


**Allegation:**

83.      None of this was true, and Plaintiff had no knowledge of it.

**Answer:**

83.      Denied.


**Allegation:**

84.      Upon information and belief, *Le Nez* has been shipped to, and installed in, Geffen's residence in New York, New York, where, upon information and belief, it remains.

**Answer:**

84.      Geffen admits the allegations in Paragraph 84.

**Xiong's Confession Of Her Theft In December 2024**

**Allegation:**

85.    In or about May 2024, months after Xiong had already orchestrated her theft and fraud as described above, she informed Plaintiff that a purported buyer was considering purchasing *Le Nez*.

**Answer:**

85.    Denied.

**Allegation:**

86.    Xiong identified the purported buyer to Plaintiff at the time as "David Martinez." Upon information and belief, there is a well known major art collector named David Martinez. Upon information and belief, however, that David Martinez had nothing to do with the events described above involving *Le Nez*.

**Answer:**

86.    Denied.

**Allegation:**

87.    Xiong told Plaintiff that the purported buyer had provided $10 million as a good faith, refundable deposit to demonstrate his seriousness so that he could have more time to consider going ahead with a possible purchase.

**Answer:**

87.    Denied.

**Allegation:**

88.     Xiong concealed from Plaintiff all of her activities between January–March 2024, as described above, and concealed from Plaintiff that a 'deal' for *Le Nez* with Defendants had already purported to close.

**Answer:**

88.     Denied.


**Allegation:**

89.     Upon information and belief, as part of the "Exchange Agreement," the Tunkls were holding the Geffen Artworks. Upon further information and belief, the Tunkls had transferred $10.5 million in cryptocurrency to Xiong's crypto wallet, from which Xiong kept $500,000 for herself and transferred $10 million to Plaintiff's crypto wallet. The fact that Xiong was the owner of the wallet transferring $10 million to Plaintiff was not openly disclosed or known by Plaintiff at the time.

**Answer:**

89.     Geffen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 and therefore denies the allegations.


**Allegation:**

90.     Upon information and belief, the Tunkls had actually received $13 million from Defendants.

**Answer:**

90.     Denied.

**Allegation:**

91.    Seven months passed without Plaintiff hearing whether the purported buyer had decided to make an offer for *Le Nez* or if he wanted his deposit back. Plaintiff was unaware that Geffen was already living with *Le Nez* in his home.

**Answer:**

91.    Denied.

**Allegation:**

92.    Plaintiff asked Xiong on December 18, 2024 if she knew what was happening with the purported buyer.

**Answer:**

92.    Denied.

**Allegation:**

93.    Xiong's response was incoherent, and Plaintiff began to worry that something was amiss.

**Answer:**

93.    Denied.

**Allegation:**

94.    Xiong identified the Tunkls to Plaintiff and claimed they were somehow responsible for the delay.

**Answer:**

94.    Geffen admits that Xiong and Plaintiff were frustrated that the Tunkls had not sold the Two Paintings, despite months of trying to do so.  Otherwise, denied.

**Allegation:**

95.    Plaintiff told Xiong to put him in touch with the Tunkls (whom Plaintiff did not know and whose names, as well as the name of their company, Ganymede, had no significance to Plaintiff).

**Answer:**

95.    Geffen admits that Xiong added Plaintiff to a WhatsApp chat that included the Tunkls.  Otherwise, denied.

**Allegation:**

96.    Xiong did so by adding Plaintiff to a WhatsApp chat that she had been having with the Tunkls.

**Answer:**

96.    Admitted.

**Allegation:**

97.    On December 18, 2024, Plaintiff wrote into the chat (in imperfect English) that he was the owner of *Le Nez* and that he was canceling any deal negotiation due to the prolonged delay.

**Answer:**

97.     Geffen denies the allegations in Paragraph 97, including without limitation insofar as the allegations inaccurately state what Plaintiff actually wrote and misleadingly characterize Plaintiff as using "imperfect English."

**Allegation:**

98.     Xiong apparently panicked at the realization that the Tunkls were likely to respond by revealing to Plaintiff the fraudulent "Exchange Agreement" and "Authorization Agreement," and, she quickly thereafter confessed her theft of *Le Nez* and fraud to Plaintiff, and revealed that *Le Nez* was now in the hands of Geffen.

**Answer:**

98.     Denied.

**Allegation:**

99.     Upon hearing Xiong's confession, Plaintiff promptly deleted his December 18, 2024 chat message with the Tunkls out of concern that they might have been in on the theft, and decided that his counsel and the proper authorities should handle the matter.

**Answer:**

99.     Geffen admits that Sun deleted a December 18, 2024 WhatsApp message directed to the Tunkls.  Otherwise, denied.

**Allegation:**

100.     By letter dated December 23, 2024, Plaintiff (through counsel) wrote to Defendants (through their counsel) to explain Xiong's theft of *Le Nez*.

**Answer:**

100.    Geffen admits that, on December 23, 2024, Plaintiff (through counsel) wrote to Geffen (through his counsel).  Otherwise, denied.


**Allegation:**

101.    After not hearing back, Plaintiff (through counsel) wrote again to Defendants (through their counsel) on January 24, 2025 and demanded that Defendants return *Le Nez* to him.

**Answer:**

101.    Geffen admits that Sun (through counsel) sent a second letter to Geffen (through his counsel) on January 24, 2025.  Otherwise, denied.


**Allegation:**

102.    Later on January 24, 2025, Defendants (through counsel) wrote back to Plaintiff (through counsel) and wrongfully refused Plaintiff's demand.

**Answer:**

102.    Denied.


## FIRST CLAIM FOR RELIEF
### (REPLEVIN)

**Allegation:**

103.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

**Answer:**

103.    Denied.

**Allegation:**

104.    Plaintiff is the rightful owner of *Le Nez*.

**Answer:**

104.    Denied.


**Allegation:**

105.    Plaintiff is entitled to immediate possession of *Le Nez*.

**Answer:**

105.    Denied.


**Allegation:**

106.    *Le Nez* was stolen from Plaintiff by Xiong.

**Answer:**

106.    Denied.


**Allegation:**

107.    Defendants are wrongfully in possession and control of *Le Nez* and purport to hold title to *Le Nez*.

**Answer:**

107.    Denied.

**Allegation:**

    108.    Plaintiff has a superior right of possession to *Le Nez* relative to Defendants.

**Answer:**

    108.    Denied.

**Allegation:**

    109.    Defendants have wrongfully refused Plaintiff's demand to return *Le Nez* to him.

**Answer:**

    109.    Denied.

**Allegation:**

    110.    *Le Nez* is a unique and identifiable work of art.

**Answer:**

    110.    Denied.

**Allegation:**

    111.    Plaintiff is entitled to his restitution of *Le Nez*.

**Answer:**

    111.    Denied.

**Allegation:**

    112.    Plaintiff is entitled to appropriate statutory prejudgment interest.

**Answer:**

112.    Denied.


## SECOND CLAIM FOR RELIEF
### (CONVERSION)

**Allegation:**

113.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

**Answer:**

113.    Denied.


**Allegation:**

114.    Plaintiff is the rightful owner of *Le Nez*.

**Answer:**

114.    Denied.


**Allegation:**

115.    Plaintiff is entitled to immediate possession of *Le Nez*.

**Answer:**

115.    Denied.


**Allegation:**

116.    *Le Nez* was stolen from Plaintiff by Xiong.

**Answer:**

116.    Denied.

**Allegation:**

117.    Defendants are wrongfully in possession and control of *Le Nez*.

**Answer:**

117.    Denied.

**Allegation:**

118.    Plaintiff has a superior right of possession to *Le Nez* relative to Defendants.

**Answer:**

118.    Denied.

**Allegation:**

119.    Defendants have wrongfully refused Plaintiff's demand to return *Le Nez* to him.

**Answer:**

119.    Denied.

**Allegation:**

120.    Plaintiff is entitled to damages amounting to the lost value of *Le Nez* and consequential damages in amounts to be determined at trial, but believed to be in substantial excess of USD $80 million.

**Answer:**

120.    Denied.

**Allegation:**

121.    Plaintiff is entitled to appropriate statutory prejudgment interest.

**Answer:**

121.    Denied.


## THIRD CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201, 2202)

**Allegation:**

122.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

**Answer:**

122.    Denied.

**Allegation:**

123.    Plaintiff is the rightful owner of *Le Nez*.

**Answer:**

123.    Denied.

**Allegation:**

124.    Defendants wrongfully maintain that Plaintiff no longer owns *Le Nez* and that they (or either of them) are the rightful owners of *Le Nez*.

41

**Answer:**

124.    Denied.

**Allegation:**

125.    There is a genuine dispute and an actual controversy and disagreement between Plaintiff and Defendants regarding ownership of *Le Nez*.

**Answer:**

125.    Denied.

**Allegation:**

126.    Plaintiff is entitled to a declaratory judgment that he is the rightful owner of *Le Nez*.

**Answer:**

126.    Denied.

## FOURTH CLAIM FOR RELIEF
### (ORDER QUIETING TITLE UNDER 28 U.S.C. § 1655)

**Allegation:**

127.    Plaintiff repeats and realleges paragraphs 1 through 102 above as if fully set forth herein.

**Answer:**

127.    Denied.

**Allegation:**

128.    Plaintiff is the rightful owner of *Le Nez*.

**Answer:**

128.    Denied.

**Allegation:**

129.    Defendants wrongfully maintain that Plaintiff no longer owns *Le Nez* and that they (or either of them) are the rightful owners of *Le Nez*.

**Answer:**

129.    Denied.

**Allegation:**

130.    There is a genuine dispute and an actual controversy and disagreement between Plaintiff and Defendants regarding ownership of *Le Nez*.

**Answer:**

130.    Denied.

**Allegation:**

131.    Plaintiff is entitled to an Order quieting title to *Le Nez* and declaring that Plaintiff, vis-à-vis the rest of the world, is the rightful owner of *Le Nez*.

**Answer:**

131.    Denied.

GEFFEN'S AFFIRMATIVE DEFENSES

Defendants assert the following defenses with respect to the causes of action alleged in the Complaint, without assuming the burden of proof or persuasion where such burden rests on Sun. Defendants reserve the right to assert other defenses and counterclaims not asserted herein if and when they become appropriate or available. Defendants incorporate herein all of the factual averments set forth in their Answer.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

As a separate and distinct affirmative defense, the Complaint, and each cause of action stated therein, fails to state a claim on which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Standing)

As a separate and distinct affirmative defense, Plaintiff lacks standing to bring the claims set forth in the Complaint.

## THIRD AFFIRMATIVE DEFENSE

### (Full Performance)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because Defendants have completely performed and fully discharged their obligations and legal duties arising out of the matters alleged in the Complaint.

## FOURTH AFFIRMATIVE DEFENSE

### (Laches)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE

**(Waiver or Release)**

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because Plaintiff expressly or impliedly waived or released his claims.

### SIXTH AFFIRMATIVE DEFENSE

**(Unclean Hands)**

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

**(Estoppel)**

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

### EIGHTH AFFIRMATIVE DEFENSE

**(No Injury)**

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because he has not suffered any injury from the alleged conduct by Defendants.

### NINTH AFFIRMATIVE DEFENSE

**(Ratification)**

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by his ratification of the conveyance of *Le Nez* to Defendants.

### TENTH AFFIRMATIVE DEFENSE

**(Accord and Satisfaction)**

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Bona Fide Purchaser)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because Defendants at all times acted in good faith, purchased *Le Nez* for value, and had reasonable grounds for believing their conduct was not wrongful, tortious, or unlawful.

## TWELTH AFFIRMATIVE DEFENSE

### (Good Faith Purchase of Goods)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because Defendants purchased *Le Nez* in good faith for value from a person with voidable title.  *See* U.C.C. § 2-403(1).

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Entrustment)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because Plaintiff entrusted *Le Nez* to a merchant who deals in goods of that kind and gave that merchant power to transfer all rights as to *Le Nez* to a buyer in the ordinary course of business. *See* U.C.C. § 2-403(2).

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Consent)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by Plaintiff's consent to the conveyance of *Le Nez* to Defendants.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Authority)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, by his assent to be bound by the agreements of those to whom he conveyed actual, implied, and/or apparent authority to bind him.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Causation)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, because Defendants were not the cause of any harm, injury, or damages alleged by Plaintiff.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Acts and Omissions of Sun or Third Parties)

As a separate and distinct affirmative defense, Plaintiff's claims are barred because any injury he sustained was caused wholly or in part by the acts and omissions of Plaintiff himself, or by the acts and omissions of other third parties, all of which were beyond Defendants' control.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Barred By Agreement)

As a separate and distinct affirmative defense, Plaintiff's claims are barred by the existence of a written agreement between the parties.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Damages offset)

As a separate and distinct affirmative defense, Plaintiff's claims are barred, in whole or in part, to the extent he seeks to recover any damages, restitution, costs, or other payments that have been previously paid by Defendants and/or received by Plaintiff. Any verdict of judgment that might be recovered must be reduced by those amounts that already have been or will in the future, with reasonable certainty, be paid to Plaintiff. Defendants are entitled to a credit, set-off, or offset for all sums of money received or available from or on behalf of any tortfeasor(s) for the same injuries alleged in Plaintiff's Complaint.

## GEFFEN'S COUNTERCLAIMS AGAINST SUN

Defendants and Counterclaim Plaintiffs David Geffen and Ithaka Trust (collectively, "Geffen"), by and through their counsel Nagy Wolfe Appleton LLP, hereby assert their counterclaims against Plaintiff Sun Yuchen Justin ("Sun").

### NATURE OF ACTION

1.    This lawsuit is a sham.  Sun, through non-party Apenft Foundation ("Apenft"), agreed to sell *Le Nez* to Geffen in exchange for $10.5 million and two paintings (the "Two Paintings").  For nearly a year after the deal closed, Sun and his art advisor Xiong tried to sell the Two Paintings for a profit (when combined with the $10.5 million) over what he paid for *Le Nez*. After they failed to find a buyer, Sun and Xiong contrived this fraudulent lawsuit, hoping also to pressure Geffen into rescinding the deal or paying Sun.  Sun has been sued by numerous former employees who have alleged that he forced them to engage in "unethical and/or illegal business activities."[1]  Sun and Xiong are now engaged in similar conduct here.  Geffen brings these counterclaims to put an end to Sun's fraud and to recover damages from Sun, including all of the attorneys' fees and other costs associated with this bogus lawsuit.

2.    By way of background, Sun purchased *Le Nez* for $78.4 million at a Sotheby's auction on November 15, 2021, announcing his purchase on Twitter that same day:[2]

---

[1] *See, e.g.*, *Zhimin v. Rainberry, et al.*, No. CGC-21-595792 (Ca. Sup. Ct. Oct. 5, 2021) at Dkt. 1, Complaint ¶ 1; *Hall, et al. v. Rainberry, et al.*, No. CGC-19-580304 (Ca. Sup. Ct. Oct. 28, 2019) at Dkt. 1, Complaint ¶ 1.  Sun also has been sued by the Securities & Exchange Commission (the "SEC") for fraud and market manipulation.  *See SEC v. Sun, et al.*, No. 23-2433 (S.D.N.Y. Mar. 22, 2023).  The SEC dropped its case only after Sun made a $30 million donation to President Trump's cryptocurrency company, World Liberty Financial.  *See* https://www.bloomberg.com/news/articles/2024-11-29/trump-s-crypto-project-was-a-bust-until-justin-sun-stepped-in?embedded-checkout=true;    https://www.salon.com/2025/03/04/justin-sun-investor-in-backed-crypto-business-gets-break-in-fraud-case/.  As of March 17, 2025, Sun had invested over $75 million in Trump's World Liberty Financial.  https://www.cnbc.com/2025/03/17/trump-world-liberty-financial-crypto-sold-550-million-in-tokens.html. World Liberty Financial has said that it "owes much of its early success to Justin [Sun]." https://finance.yahoo.com/news/founder-trumps-world-liberty-financial-074249116.html.
[2] Due to time zone differences, dates of alleged events and social media timestamps may differ by one day.



3.      The "H.E." in Sun's Twitter handle stands for "His Excellency," a moniker that Sun

regularly uses for himself, has insisted his employees use when referring to him, and includes on

his personal website, www.hejustinsun.com.[3]

4.      The next day (*i.e.*, November 16, 2021), Sun Tweeted that he would be donating *Le*

*Nez* to his foundation, Apenft:

---

[3] Sun has referred to himself as "His Excellency" ever since 2021 when he briefly assumed the role of Grenada's Ambassador to the World Trade Organization ("WTO"). Sun continues to use the moniker even though his term as Grenada's Ambassador terminated in 2023. *See* https://fortune.com/crypto/2023/03/31/his-excellency-sec-lawsuit-justin-sun-grenada-diplomat-wto/. Sun also insists that his employees refer to him as "His Excellency." *See* https://www.theverge.com/c/22947663/justin-sun-tron-cryptocurrency-poloniex. Upon information and belief, Sun purchased his ambassadorship from a Grenadian official for $500,000. *See* https://www.thenewtodaygrenada.com/local-news/nnp-caught-selling-diplomatic-passports/.



5.    Apenft publicly thanked Sun (via Twitter) for his donation that same day, and Sun retweeted Apenft's post, boasting that Apenft's "collection" now "exceeds $100 million!"

6.    Since at least 2021, and throughout 2022, 2023 and 2024, both Sun and Apenft publicized that non-party Sydney Xiong ("Xiong") was the "Director" of Apenft, a fact that Sun continues to publicize on his personal website to this day.[4]  Sun also held out Xiong, whom he admits was his "employee," as his "art advisor" and his "liaison to the art world."

7.    In fact, it was Xiong who, acting as Sun's agent, placed Sun's winning bid for *Le Nez* with Sotheby's.  Xiong also placed the winning bids for other multimillion-dollar works of art that Sun purchased, including a work by Picasso.

8.    In late 2023, Sun decided that, rather than let Apenft keep *Le Nez*, he instead would sell the work and pocket the cash.  Since Sun created Apenft, funded it, and controlled it, Apenft did as it was told.  Acting through Xiong—who, again, was both Sun's personal art advisor and Apenft's artistic director—Apenft entered into an agreement with Geffen in January 2024.  As described above, pursuant to that agreement (the "Exchange Agreement"), Apenft transferred *Le Nez* to Geffen; and Geffen transferred to Apenft (i) the Two Paintings and (ii) $10.5 million.  As

---

[4] *See* https://hejustinsun.com/philanthropy/3 (referring to "Sydney Xiong, APENFT Art Director and Curator").

part of the transaction, Sun signed a letter agreement addressed to Geffen personally guaranteeing that Apenft owned the work and that it was "free and clear of any and all liens."  A copy of that letter agreement (the "Sun Side Letter") is attached hereto as **Exhibit 1**.

9.    After the agreements were signed, the parties performed.  Apenft transferred *Le Nez* to Geffen, and Geffen, in turn, transferred the money and the Two Paintings to Apenft.

10.    Sun now falsely alleges that "*Le Nez* was stolen from Plaintiff by [Xiong]" and that "Xiong has confessed to the crime."  (Complaint ¶ 2.)  Sun's allegations are nonsense.  Worse, they are part of a deliberate fraud being perpetrated by Sun upon Geffen and this Court.

11.    <u>First</u>, *Le Nez* was not stolen by Xiong.  Xiong does not have *Le Nez*—Geffen does.  Nor does Xiong have the money or the paintings: Sun has the money, and the art dealers that Sun selected—David and Cole Tunkl (the "Tunkls")—are holding the Two Paintings on his behalf.  Sun, *who surreptitiously deleted his WhatsApp messages with the Tunkls before he filed this lawsuit*, used the Tunkls to try to sell the Two Paintings throughout 2024.

12.    So what, exactly, did Xiong steal?  Sun and his multiple sets of lawyers cannot keep their story straight.  Sun, through his current lawyers (Pryor Cashman LLP), falsely claims that Xiong told him that Geffen paid only $10 million, not $10.5 million, and now claims that Xiong stole the $500,000 difference.  (*See* Complaint ¶¶ 87, 89.)

13.    But Sun's original set of lawyers (Harder Stonerock LLP) directly contradicted those claims in a letter they sent to Geffen in December 2024 (the "December Letter," a copy of which is attached hereto as **Exhibit 3**).  According to Harder Stonerock, *all* of the "$10.5" million was paid to "Sun, who is holding these funds, and is prepared to return them forthwith, upon a resolution of this matter."  Moreover, Harder Stonerock also attached and relied upon "a statutory declaration" by Xiong—a declaration which Sun pointedly chose *not* to attach to his Complaint.

In that declaration (the "Xiong Declaration"), Xiong likewise states that she told Sun about the $10.5 million, not only $10 million:

| DECEMBER LETTER & XIONG DECL. | FEBRUARY COMPLAINT |
|---|---|
| "In fact, the US$10.5M consideration was explained by me to Sun to be only a deposit to secure a transaction."<br><br>*(Xiong Declaration at 2.)* | 87. Xiong told Plaintiff that the purported buyer had provided $10 million as a good faith, refundable deposit to demonstrate his seriousness so that he could have more time to consider going ahead with a possible purchase. |
| "Ganymede [*i.e.*, the Tunkls] unilaterally remitted the USDC equivalent of $10.5 USD to Sun, who is holding these funds, and is prepared to return them forthwith, upon a resolution of this matter.<br><br>*(December Letter at 2.)* | 89. Upon information and belief, as part of the "Exchange Agreement," the Tunkls were holding the Geffen Artworks. Upon further information and belief, the Tunkls had transferred $10.5 million in cryptocurrency to Xiong's crypto wallet, from which Xiong kept $500,000 for herself and transferred $10 million to Plaintiff's crypto wallet. The fact that Xiong was the owner of the wallet transferring $10 million to Plaintiff was not openly disclosed or known by Plaintiff at the time. |

14.     Sun's own December Letter, and the Xiong Declaration that his lawyers attached to it, establishes that there are only two possibilities: (a) Xiong did not steal anything at all, and Sun has all of the $10.5 million (in Harder Stonerock's words, Sun "is holding these funds"); or (b) if Xiong did keep $500,000 of the $10.5 million (as Pryor Cashman now claims), then *Sun knew that she did so*, because Xiong had "explained" to him that the amount was "$10.5M," not only "$10 million" as Sun now inconsistently alleges in his Complaint.[5]

15.     Second, Sun also cannot keep his story straight about which of his signatures Xiong purportedly forged and why.  According to the sworn Xiong Declaration that Sun's first set of lawyers at Harder Stonerock attached to their December Letter, Xiong forged Sun's signature on two documents, both of which are dated March 23, 2024: (i) the "First Amendment" to the

---

[5] As discussed further below, if Xiong were allowed to keep the $500,000 after telling Sun about it, that amount would have been paid to her as a commission.  Art advisors like Xiong typically are paid commissions when deals close—as this deal did in 2024.

Exchange Agreement and (ii) the "Authorization Agreement." (*See* Xiong Decl. at 1-2.) Both of these purported forgeries occurred on "23 March 2024," and both were attached as exhibits to the Xiong Declaration (and, thus, to the December Letter). (*Id.*) Why did Xiong forge these two signatures? According to her declaration, it was because of "time pressure":

> On 23 March 2024, … [i]n response to pressure from both David and Cole, and under duress, it was at that stage that I forged the signature of Mr. Sun thereon …. On 23 March 2024, … due to pressure being asserted on me to conclude the transaction, [I] again forged the signature of Mr. Sun thereon …. The reason why I … forged the signature of Mr. Sun was because I was acting under the duress and pressure of Mr. David Tunkl and Mr. Cole Tunkl, who kept representing to me that they already had potential buyers for the [Two Paintings] and pressuring me to sign the agreements as quickly as possible. Upon their duress and insistence, and based on time pressure, I … forged Mr. Sun's signature on the above [March 2024] agreements.

(Xiong Decl. at 1-2.) A copy of the Xiong Declaration is attached hereto as **Exhibit 4**.

16.    The Complaint, which Sun's new lawyers filed in February 2025, tells a very different story. According to the Complaint, Xiong "forged Plaintiff's signature" in "January 2024" (Complaint ¶ 5), two months before the "23 March 2024" date that Xiong swore to in her declaration.

17.    Why does the Complaint change the date of the forgery? Because, to maintain his false narrative, Sun needs his signature on the Sun Side Letter, which Sun signed on January 23, 2024, to be a forgery. The December Letter and the Xiong Declaration do not claim that Xiong forged Sun's signature on the Sun Side Letter. On the contrary, as shown above, Xiong emphasizes that "it was at that stage," specifically on "23 March 2024," that she purportedly forged Sun's signatures on the First Amendment and on the Authorization Agreement.

18.    The Complaint changes the reason for the forgery, too: Xiong forged Sun's signature not because of "time pressure," as Xiong stated in her sworn declaration, but "[t]o further her fraud and theft." (Complaint ¶¶ 5, 6.)

19.     The Complaint trumpets, on its first page, that "Xiong has confessed to the crime." (Complaint ¶ 2.)  But, as noted, Sun chose *not* to attach the Xiong Declaration—*i.e.*, her purported "confession"—to his Complaint.  Nor could he do so, given the inconsistencies between what Sun's new lawyers are saying now and what his prior lawyers and Xiong herself actually said in December 2024:

|  | XIONG DECL. / DECEMBER LETTER | SUN'S COMPLAINT |
|---|---|---|
| **Date of forgery:** | "23 March 2024" | "January 2024" |
| **Documents on which Sun's signature purportedly was forged:** | - First Amendment<br>- Authorization Agreement | "deal documents," including the Sun Side Letter |
| **Claims Sun Side Letter signature was forged?** | No | Yes |
| **Reason for forgery?** | "time pressure" | "[t]o further her fraud and theft" |
| **What Xiong stole:** | Nothing | $500,000 |

20.     <u>Third</u>, Xiong *has* confessed to what is going on here, but her real confession is neither what she said in her declaration nor the glaringly inconsistent story told in the Complaint. Instead, in or about November 2024, Xiong stated on a phone call with David Tunkl that, since the Tunkls were unable to sell the Two Paintings at a high enough price, *Sun intended to hire U.S. lawyers to contrive a lawsuit to pressure Geffen to rescind the deal*.  That contrived lawsuit is the suit that Sun filed before this Court.

21.     Given that Sun's lawsuit is itself a fraud, it is no wonder that it is wildly inconsistent with the record.  What follows are just a few additional examples of inconsistencies:

a.  As shown above, Sun's first set of lawyers stated that Sun received all of the "$10.5" million. And, in an affidavit that clearly was drafted by Sun's attorneys, Xiong stated that she told Sun about the $10.5 million. By contrast, Sun now claims he received only "$10 million."

b.  Sun's first set of lawyers, relying on the Xiong Declaration, claimed Xiong forged Sun's signatures on "23 March 2024," due to "time pressure." Sun's current lawyers claim the forgery occurred in "January 2024," to "further her fraud and theft" of the $500,000.

c.  Sun now suggests that he knows very little about Apenft, alleging that "upon information and belief and to Plaintiff's understanding, APENFT has never been an art collector or dealer and has never actually owned, bought or sold any physical art." (Complaint ¶ 28.) But Sun *founded* Apenft, and he even originally named it after himself: "Justnft." Moreover, Sun also admits that he "posted on social media that he planned to donate *Le Nez* to APENFT." (*Id.* ¶ 29.) Why would he do that if it was his "understanding" that "APENFT has never been an art collector or dealer and has never actually owned, bought or sold any physical art"?

d.  Sun also publicly announced multiple other donations to Apenft (and its predecessor Justnft), including works by Picasso, Warhol and Kaws.[6] Again, those are pretty odd public commitments for Sun to make if—as he alleges to this Court—his "understanding" is that Apenft "has never been an art collector or dealer and has never actually owned, bought or sold any physical art." (*Id.* ¶ 28.) There are only two possibilities here: (i) Sun is the kind of guy who repeatedly promises to make multimillion dollar donations and then fails to honor his word; or (ii) Sun's allegations about Apenft are false.

e.  Yet another contradiction is Sun's admission that he allowed Apenft "to share sponsorship credit for the Giacometti Fondation exhibition [of *Le Nez* in 2023]." (*Id.* ¶ 31.) Why would he do that if he never donated the work to Apenft and Apenft "has never been an art collector"?

f.  Sun alleges in his Complaint that "Xiong was not the President or an employee of APENFT" and claims that she was falsely "holding herself out as the representative" of Apenft. (*Id.* ¶¶ 3, 69.) But Sun's own attorneys have described Xiong as "a former representative of Apenft." Ex. 3 at 1. And numerous media outlets, including in multiple stories quoting Sun, have identified Xiong as Apenft's artistic "director."[7] To this day, Sun continues to identify Xiong as Apenft's "Art Director" and "Curator" on his personal website, www.hejustinsun.com.[8]

---

[6] *See, e.g.*, https://news.artnet.com/market/justin-sun-le-nez-78-million-2035562.
[7] *See, e.g.*, https://news.artnet.com/buyers-guide/5-questions-sydney-xiong-director-art-meets-finance-foundation-apenft-2059190; https://whitewall.art/art/h-e-justin-sun-and-sydney-xiong-bring-the-digital-and-corporeal-with-apenft-foundation/; https://web.archive.org/web/20211110011512/https://finance.yahoo.com/news/apenft-foundation-launches-100million-art-214959620.html (retrieved from the WayBack machine).
[8] https://hejustinsun.com/philanthropy/3.

g.  Sun claims that Xiong "had no authority to make deals for Plaintiff (involving art or other assets)." (*Id.* ¶ 41.) Nonsense. Xiong is the individual who placed Sun's $78.4 million bid for *Le Nez* with Sotheby's.[9] She also placed his $20 million bid for Pablo Picasso's *Femme Nue Couchée au Collier (Marie-Thérèse)* and his $2 million bid for Andy Warhol's *Three Self Portraits*. Xiong not only had "authority to make deals for Plaintiff" "involving art," she repeatedly and very publicly used that authority. In Sun's own words, Xiong was his art "advisor" and his "liaison to the art world." (*Id.* ¶ 41.)

h.  Sun claims that Xiong stole hundreds of thousands of dollars from him. Yet Sun apparently has not filed any police report against Xiong, nor has she been arrested. Instead, she appears to be in Beijing, where she recently became a member of the "Young Associates" program at the UCCA Center for Contemporary Art, a museum located in Beijing. In fact, according to his Complaint, Sun has not even bothered to ask Xiong to return the $500,000. As shown above, according to Sun's lawyers at Harder Stonerock, Xiong did not steal the $500,000 from Sun—that is an entirely new claim made for the first time by his new lawyers when this lawsuit was filed.

i.  Sun alleges that, after his prior counsel sent the December Letter to Geffen, Geffen "wrongfully refused Plaintiff's demand" for the return of *Le Nez*. (*Id.* ¶ 102.) Not so. Instead, Geffen's attorneys wrote back to Sun's lawyers, pointing out some of the glaring holes in his story and asking Sun to answer some "basic questions" about his claims and produce basic documents, including his communications with Xiong. Sun refused to answer those basic questions or to produce any of those documents.

22.   Sun has been sued by multiple former employees who have alleged that he punished employees for their "unwillingness and refusal to engage in unethical and/or illegal business activities."[10] Multiple previous employees have witnessed Sun physically strike his employees,[11] and some even fear that going against Sun might put their lives at risk.[12] Sun has made multiple false statements in those prior lawsuits (the "Former Employee Suits"), including falsely claiming diplomatic immunity in connection with his terminated ambassadorship to Grenada in order to avoid having to sit for a deposition—leading one of the tribunals to issue terminating sanctions for

---

[9] *See, e.g.,* https://www.nytimes.com/2022/02/12/arts/design/nft-collectors-artwork.html.
[10] *See Zhimin v. Rainberry, et al.*, No. CGC-21-595792 (Ca. Sup. Ct. Oct. 5, 2021) at Dkt. 1, Complaint ¶ 1; *Hall, et al. v. Rainberry, et al.*, No. CGC-19-580304 (Ca. Sup. Ct. Oct. 28, 2019) at Dkt. 1, Complaint ¶ 1.
[11] *See Zhimin* and *Rainberry* Complaints, *supra* n.9.
[12] https://www.theverge.com/c/22947663/justin-sun-tron-cryptocurrency-poloniex.

his misconduct.[13] A copy of the order entering terminating sanctions against Sun (the "Terminating Sanctions Order") is attached hereto as **Exhibit 6**.

23.    Sun is now continuing his pattern of sanctionable misconduct, including abuse of a former employee (*i.e.*, Xiong) and of the judicial process, here.  Geffen brings these counterclaims to clear title to *Le Nez* and to ensure Sun pays for the damages caused by his misconduct.

**PARTIES**

24.    Counterclaim Plaintiff David Geffen is an individual who resides in California.

25.    Counterclaim Plaintiff Ithaka Trust is a trust created under the laws of California, for which Geffen is the sole trustee.

26.    Upon information and belief, Counterclaim Defendant Justin Sun is an individual who resides in Hong Kong, China.

**JURISDICTION AND VENUE**

27.    Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. § 1332(a) because Counterclaim Plaintiffs Geffen and Ithaka Trust are domiciled in New York and California, respectively, and Counterclaim Defendant Sun is domiciled in Hong Kong, China.

28.    This Court may exercise personal jurisdiction over Sun because he has voluntarily commenced the present proceedings in this Court, consenting to its jurisdiction.

29.    Moreover, Sun consented to this Court's jurisdiction when binding himself to the Exchange Agreement, which provides that any "dispute arising [t]hereunder shall be resolved in the courts of the State of New York, County of New York, or the United States Federal courts located in the State of New York, County of New York, and the parties consent to the personal jurisdiction of such courts."

---

[13] https://protos.com/scoop-justin-sun-falsely-claimed-diplomatic-immunity-in-lawsuit/.

30.     This Court also has jurisdiction to issue a judgment removing a cloud upon the title to *Le Nez* pursuant to 28 U.S.C. §§ 1655 and 2201(a) because *Le Nez* is located in this District and an actual controversy exists between the parties as to its ownership.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Counterclaim Plaintiffs purchased *Le Nez* while located in this District, and also arranged for delivery of *Le Nez* to Geffen's home in this District.  *Le Nez* itself currently remains located in this District.

32.     Alternatively, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Sun is subject to this Court's personal jurisdiction and has consented to venue in this District when he filed suit here (*see supra* ¶¶ 28-29).

## FACTUAL BACKGROUND

### I.     SUN CREATED APENFT AND USED IT TO HOLD HIS ART COLLECTION

#### A.     Sun Created "Justnft," Later Renamed "Apenft"

33.     In or around April 2021, Sun registered a public limited liability company named Justnft Foundation Ltd. in the Republic of Singapore.

34.     At the time of incorporation, Justnft Foundation Ltd. had only one member: Justin Sun.

35.     In May 2021, an application was submitted to change the name of the company Justnft Foundation Ltd. to Apenft Foundation Ltd.

36.     In the application to change the company name, Sun was identified as an "[o]fficer" of the company, with the positions of "director" and "shareholder."

**B.    Apenft Was In The Business Of Buying And Selling Physical Works Of Art**

37.    Since its inception, Apenft has identified as one of its principal business activities the "retail sale of antiques and works of art."[14]

38.    In addition to its operations with respect to digital artworks and NFTs, which are backed by the blockchain of Sun's crypto company, TRON, Apenft has engaged in the acquisition, exhibition, and selling of physical works of art.

39.    Within its first year of incorporation, in 2021, Apenft had a team of employees comprised of personnel from traditional art fields, including from institutions such as Christie's and Sotheby's.[15]

40.    As of August 2021, Apenft had acquired multiple physical artworks by renowned artists, including Pablo Picasso, Andy Warhol, and Jean-Michel Basquiat.[16]  According to the Apenft Whitepaper, Apenft's "collection" in 2021 also included work by Boris Artzybasheff, in addition to the aforementioned works by Picasso and Warhol.[17]

**C.    Sun Used Apenft To Hold His Art Collection—And To Profit From The Sale Of Its Token**

41.    Most if not all of the artwork acquired by Apenft originally was purchased by Sun (and/or entities owned or controlled by him), and then donated to Apenft.[18]

---

[14] *See, e.g.*, Singapore Accounting and Corporate Regulatory Authority "Business Profile" for Apenft, available at https://www.bizfile.gov.sg/.

[15] *See* https://bitcoinist.com/justin-sun-launches-first-ever-picasso-nft-with-just-nft/.

[16] *See* https://www.accessnewswire.com/newsroom/en/business-and-professional-services/barrett-wissman-named-chief-investment-advisor-of-apenft-foundati-661501.

[17] *See* https://foundation.apenft.io/book/APENFT%20White%20Paper.pdf.

[18] As alleged *infra*, Counterclaims Paragraphs 91-100, Sun authorized Xiong to place bids for these artworks on his behalf.

42.    For example, on March 23, 2021, Sun acquired Pablo Picasso's *Femme Nue Couchee Au Collier* and Andy Warhol's *Three Self Portraits* through an auction held by Christie's.[19]

43.    Within two months of Sun's acquisition, on May 14, 2021, Apenft tweeted that Sun had donated the two works to Apenft:[20]



44.    Six weeks prior, Sun himself publicly stated that he had purchased these works for Apenft (then known as Justnft):[21]

---

[19] *See* https://bitcoinist.com/justin-sun-launches-first-ever-picasso-nft-with-just-nft/.
[20] *See* https://x.com/apenftorg/status/1393189726689972224.
[21] *See also* https://news.artnet.com/market/crypto-investor-missed-beeple-buys-picasso-1956473 (Christie's indicated that Sun purchased the works for Justnft).



45.     At the time Sun publicly stated that he had purchased Picasso's *Femme nue couchee au collier* for Apenft (then named Justnft), he believed that statement to be true.

46.      At the time Sun publicly stated that he had purchased Warhol's *Three Self Portraits* for Apenft (then named Justnft), he believed that statement to be true.

47.     Sun donated one or more works of art to Apenft.

48.     Sun is a resident of Hong Kong.

49.     As a resident of Hong Kong, Sun is subject to taxation in Hong Kong.

50.     Upon information and belief, Sun attempted to obtain tax benefits from donating art to Apenft.

51.     Upon information and belief, Sun did obtain tax benefits from donating art to Apenft.

52.     Upon information and belief, Sun owned (directly and/or through entities he owned or controlled) at least some of Apenft's native tokens, called "APENFT."

53.     Upon information and belief, Sun sought to profit from sales of his holdings of APENFT tokens.

54.     Upon information and belief, Sun did profit from sales of his holdings of APENFT tokens.

D.     **Sun Continued To Control Apenft**

55.     Soon after founding Apenft, Sun ostensibly stepped down as a director in order to remove his legal affiliation with the foundation.  Sun similarly stepped down as CEO of TRON in 2021.

56.     Nevertheless, upon information and belief, Sun still exerts control over Apenft.  He likewise still exerts control over TRON.

57.     Sun asserts that Apenft is owned by one of his "relatives."  (Complaint ¶ 4.)  Upon information and belief, that relative is Sun's step-mother.

58.     Upon information and belief, Sun's step-mother paid him a *de minimis* sum, no more than $100,000 for legal ownership of Apenft.

59.     It has been reported that Sun exerts control over various companies that he has formed or caused to be formed but over which he disclaims any legal ownership.[22]

---

[22] https://protos.com/justin-sun-fights-a-lot-of-lawsuits-on-behalf-of-companies-he-doesnt-own/.

## II.    Sun And Apenft Employed Xiong As Their Art Advisor, Curator And Liaison To The Art World

### A.    Xiong Was An Art Advisor, Curator, And Dealmaker

60.    Upon information and belief, Xiong is an individual currently residing in Beijing. She has academic, personal, and professional experience in the arts.

61.    Xiong holds several Bachelor's Degrees, including in: (i) French Language, from Sorbonne University in France; (ii) Art Markets, from the IESA Arts and Culture School in France; and (iii) Economics, from the University of Groningen in the Netherlands.

62.    Since at least 2018, Xiong has been—and continues to be—actively involved in the art industry, including through various contemporary arts organizations.

63.    For example, Xiong donated to and was a member of the Director's Council of the Museum of Modern Art in New York City for the 2022-2023 fiscal year.

64.    Xiong has been interviewed by and featured in numerous outlets such as *Artnet*, the *New York Times*, and *Whitewall*, among others, regarding her activities in the art industry.

65.    In one profile published by *ArtReview*, Xiong was described as "a professional art consultant and writer, specializing in collection management and art evaluation of post-war and contemporary art."[23]

66.    Xiong is known more broadly throughout the art world to be an art curator, freelance art dealer, and arts investment manager for private investors. She is specifically known to be a representative of high-net-worth Asian buyers and sellers of physical arts, serving as an agent in connection with the purchase and sale of physical artworks from/to European and American sellers. Xiong connects her principals with prospective buyers and sellers, and then

---

[23] https://artreview.com/about/; https://artreview.com/talk-web3-and-the-future-of-art-patronage/.

helps facilitate and execute the transactions for physical artworks.  She has served in such roles for at least five years, dating back to before the COVID-19 pandemic.

**B.**    **Sun And Apenft Publicly Held Out Xiong As Apenft's Art Director And Curator, Responsible For Art Acquisitions**

67.    Since 2021, Sun and Apenft publicly have presented Xiong as a representative of Apenft.

68.    Specifically, since 2021, Sun and Apenft repeatedly have stated that Xiong is Apenft's "Art Director" and "Curator."

69.    For example, an August 2021 article highlighted Apenft's recruitment of IMG Artists' Barry Wissman as Apenft Chief Investment Advisor.  The two individuals interviewed in connection with the article were Sun, on behalf of TRON, and Xiong, on behalf of Apenft.  Xiong was described as Apenft's "curator and art director."[24]

70.    Several months later, a November 2, 2021 article by *Yahoo! Finance* explained a joint venture by Apenft, on the one hand, and TRON, on the other hand, to launch a $100 million "Art Dream Fund."  The story included one quote from Apenft, provided by Xiong, and one from TRON, provided by Sun.  The article described Xiong as Apenft's "Art director and curator."[25]

71.    In December 2021, Apenft held a contest for digital artists who were judged by a panel that included Sun and Xiong.  In connection with that contest and her role on the panel, Xiong was described as Apenft "art director and curator."[26]

---

[24] https://cryptobriefing.com/barrett-wissman-named-chief-investment-advisor-of-apenft-foundation/?utm_medium=referral&utm_source=coinstats.
[25] https://web.archive.org/web/20211110011512/https://finance.yahoo.com/news/apenft-foundation-launches-100million-art-214959620.html.
[26] https://www.artnews.com/art-news/sponsored-content/apenft-announces-winners-digital-artists-1234613304/.

72.     In January 2022, *Artnet* published a feature story regarding Apenft based on an interview with Xiong. The story—including its title—described Xiong as "Director" of Apenft.[27] Another article by *Artnet* that same month described Xiong as a "veteran curator" who is "now the foundation's director."[28]

73.     On July 14, 2022, TRON (Sun's company) published on its website a podcast interview with Xiong. The interview—which discussed, among other matters, Xiong's career at Apenft—opened with an introduction of Xiong by the TRON interviewer. The interviewer introduced Xiong as "Director" of Apenft.

74.     The interview with Xiong that TRON published on its website on July 14, 2022, has since been deleted.[29]

75.     On July 25, 2022, *Whitewall* conducted a joint interview of Sun and Xiong together, whom *Whitewall* described as the two "minds behind the [Apenft] foundation." Sun and Xiong took turns responding to the reporter's question. Xiong was introduced as the "director" of Apenft.[30]

76.     Around August 2022, Apenft announced that it would be launching the second call of its $100 million "Art Dream Fund."[31] Xiong was interviewed in connection with the press release, where she again was described as "director of the APENFT Foundation."[32]

---

[27] https://news.artnet.com/buyers-guide/5-questions-sydney-xiong-director-art-meets-finance-foundation-apenft-2059190.
[28] https://news.artnet.com/market/justin-sun-interview-apenft-2062888.
[29] A transcript of the interview was retrieved using the WayBack machine. *See* https://web.archive.org/web/20240518165005/https://trondao.org/podcasts/episode-10-tron-grand-hackathon2022-buidling-on-chain-projects-protocols/.
[30] https://whitewall.art/art/h-e-justin-sun-and-sydney-xiong-bring-the-digital-and-corporeal-with-apenft-foundation/.
[31] Sun has announced that he sponsored $100 million for each call of the Art Dream Fund. Upon information and belief, Sun has never contributed any of his own funds to the Art Dream Fund.
[32] https://laotiantimes.com/2022/08/03/apenft-foundation-announces-2022-open-call-theme/.

77.    As Art Director and Curator of Apenft, Xiong has been responsible for the acquisition, management, and curation of artwork.

78.    In a 2022 interview with *Artnet*, Xiong described her "main responsibilities" as Art Director and Curator of Apenft to include: "APENFT's art acquisitions, collection management, and curatorial planning and implementation."[33]

79.    On its website, TRON has described Xiong's responsibilities, in her capacity as "director of APENFT Foundation," to include "managing art collections of APENFT."[34]

80.    In addition to being referred to as Art Director and Curator, Xiong has also been described in the public domain as a "co-founder" of Apenft together with Sun.[35]

81.    To this day, Sun continues to identify Xiong as "APENFT Art Director and Curator" on his personal website, www.hejustinsun.com.[36]

82.    Xiong has been paid for the services she provided to Apenft.

83.    Upon information and belief, Apenft paid Xiong for the services she provided to Apenft.

84.    Upon information and belief, Sun paid Xiong for the services she provided to Apenft.

85.    Upon information and belief, entities owned or controlled by Sun paid Xiong for the services she provided to Apenft.

86.    Prior to Sun filing this lawsuit, Xiong was affiliated with Apenft on LinkedIn.

---

[33] https://news.artnet.com/buyers-guide/5-questions-sydney-xiong-director-art-meets-finance-foundation-apenft-2059190.
[34] The page on TRON's website containing this description has since been deleted.  It has been retrieved by the Wayback machine, available at:
https://web.archive.org/web/20230330045857/https://dev.trondao.org/hackathon/judges/sydney-xiong/.
[35] *See, e.g.*, https://iq.wiki/wiki/sydney-xiong.
[36] *See* https://hejustinsun.com/philanthropy/3.

87.     After this lawsuit was filed, at the request of Sun and/or individuals working for Sun, Xiong's affiliation with Apenft was removed from LinkedIn.

**C.     Sun Publicly Held Out Xiong As His Personal Art Advisor And Liaison To The Art World—And Repeatedly Authorized Her To Enter Into Art Transactions On His Behalf**

88.     After he founded TRON, Sun became increasingly involved in the art world, seeking to publicly build an art collection.

89.     Sun used Xiong as his personal art advisor and liaison to the art world.

90.     Since at least 2021, Sun publicly has represented that Xiong has been his "art adviser."[37]

91.     Since at least 2021, Xiong acted as Sun's representative with respect to transactions for works of art.

92.     Since at least 2021, Xiong served as Sun's intermediary in one or more negotiations for the purchase or sale of fine art.  One or more of those negotiations led to an actual purchase or sale of fine art.

93.     For example, and without limitation, at a March 23, 2021 auction held by Christie's, Xiong assisted Sun in purchasing Pablo Picasso's *Femme Nue Couchée au Collier (Marie-Thérèse)*.[38]

94.     Xiong, with authority from Sun, placed the winning bid of approximately $20 million for Picasso's *Femme Nue Couchée au Collier (Marie-Thérèse)* on Sun's behalf.

95.     Xiong, with authority from Sun, assisted in executing the transaction, including papering relevant transaction documents, on Sun's behalf.

---

[37] *See, e.g.*, https://www.nytimes.com/2024/11/21/arts/design/banana-auction-explainer-cattelan.html.
[38] *See* https://www.nytimes.com/2024/11/21/arts/design/banana-auction-explainer-cattelan.html.

96.     Upon information and belief, Xiong also assisted Sun in his purchase of Andy Warhol's *Three Self Portraits* at the same March 23, 2021 Christie's auction.

97.     Xiong, with authority from Sun, placed the winning bid of approximately $2 million for Warhol's *Three Self Portraits* on Sun's behalf.

98.     Xiong, with authority from Sun, worked to execute the transaction, including papering relevant transaction documents, on Sun's behalf.

99.     Upon information and belief, Xiong also assisted Sun in 2024 in his purchase of the *Comedian*, placing the winning bid for the work on his behalf.[39]

100.     On multiple occasions, Sun discussed potential art transactions with Xiong beforehand and then instructed Xiong to bid or negotiate and, ultimately, execute the transaction on his behalf.

101.     Sun exchanged electronic communications with Xiong concerning his negotiations of fine art transactions.

102.     Sun exchanged electronic communications with Xiong concerning his purchase of *Le Nez*.

103.     Sun exchanged electronic communications with Xiong concerning his purchase of *Femme Nue Couchée au Collier (Marie-Thérèse)*.

104.     Sun exchanged electronic communications with Xiong concerning his purchase of *Three Self Portraits*.

105.     Sun exchanged electronic communications with Xiong concerning his purchase of *Comedian*.

---

[39] https://www.nbcnews.com/news/us-news/man-spent-62-million-banana-duct-taped-wall-says-going-eat-rcna181172; https://www.nytimes.com/2024/11/21/arts/design/banana-auction-explainer-cattelan.html.

106.    Sun exchanged electronic communications with Xiong concerning his sale of fine art.

107.    Upon information and belief, Xiong assisted Sun with the sale of one or more works of fine art in 2021.

108.    Upon information and belief, Xiong assisted Sun with the sale of one or more works of fine art in 2022.

109.    Upon information and belief, Xiong assisted Sun with the sale of one or more works of fine art in 2023.

110.    Upon information and belief, Xiong assisted Sun with the sale of one or more works of fine art in 2024.

111.    Upon information and belief, Xiong was compensated for her assistance to Sun in connection with his acquisition and/or sale of artworks.

112.    Upon information and belief, Apenft paid Xiong for the services she provided to Sun.

113.    Upon information and belief, Sun paid Xiong for the services she provided to Sun.

114.    Upon information and belief, entities owned or controlled by Sun paid Xiong for the services she provided to Sun.

115.    Upon information and belief, Xiong has been paid one or more commissions in connection with Sun's fine art transactions.

116.    Upon information and belief, Sun (either directly and/or through entities he owns or controls) has paid Xiong one or more commissions in connection with his fine art transactions.

117.    Upon information and belief, from at least 2021 to present, Sun has authorized Xiong to sign one or more documents on his behalf.

118.    Upon information and belief, Sun has authorized Xiong to sign one or more documents on his behalf using his electronic signature (*i.e.*, an electronically stored image of his signature).

119.    Upon information and belief, Sun has authorized employees and/or agents to sign documents on his behalf using his electronic signature (*i.e.*, an electronically stored image of his signature).

120.    Upon information and belief, from at least 2021 to present, Sun and Xiong regularly communicated by electronic means, including, without limitation, by email, text messages, WhatsApp, and other messaging channels.

121.    Upon information and belief, Sun and Xiong frequently communicated via encrypted messaging channels.

## III.    SUN ACQUIRED AND SUBSEQUENTLY DONATED *LE NEZ*

### A.    <u>Sun, Through Xiong, Purchased *Le Nez*</u>

122.    In 2021, Sun authorized Xiong to place a bid on his behalf for *Le Nez* at the November Sotheby's auction.

123.    Acting with authority from Sun, Xiong placed the winning bid for *Le Nez* at that auction.  The winning bid that Sun authorized, and which Xiong placed for him, ultimately led to Sun's purchase of the work for $78.4 million.

124.    In addition to placing the winning bid, and again with authority from Sun, Xiong facilitated Sun's transaction with Sotheby's, including by signing one or more of the transaction documents.

125.    Upon information and belief, Xiong, again acting with authority from Sun, coordinated the transport of *Le Nez* from Sotheby's.

126.    After the auction, Sun promptly tweeted that he acquired *Le Nez* at the auction:



**B.    Immediately After Purchasing *Le Nez*, Sun Announced His Donation Of *Le Nez* To Apenft**

127.    The day after his purchase of *Le Nez*, Sun announced that he would be donating *Le Nez* to Apenft:



128.    Sun's announcement that he would donate *Le Nez* to Apenft was consistent with his past practice of purchasing renowned works of art at auction and then, soon after, announcing that he had donated the work of art to Apenft.

129.    Apenft itself then announced that Sun had donated *Le Nez* to Apenft and thanked Sun.  Sun retweeted Apenft's tweet that confirmed the donation.  In his retweet of Apenft's post, Sun boasted that Apenft's "collection" now "exceeds $100 million!"

## IV.    STARTING IN 2023, THE GIACOMETTI FOUNDATION EXHIBITED *LE NEZ*—IN PARTNERSHIP WITH ITS OWNER, APENFT

### A.    Xiong Met Catherine Grenier, The Head of Giacometti Foundation, And Negotiated The Exhibition of *Le Nez*

130.    Sometime following Sun's announcement that he had donated *Le Nez* to Apenft, Xiong became acquainted with Catherine Grenier, the Director of the Fondation Giacometti ("Giacometti Foundation") and President of the Institut Giacometti ("Giacometti Institute").

131.    Sometime in 2023, the Giacometti Foundation sought to have *Le Nez* publicly exhibited at the Giacometti Institute in Paris, France.  Xiong negotiated the terms of that exhibition with Ms. Grenier and others at the Giacometti Foundation, and ultimately agreed that *Le Nez* would be part of the exhibition.

### B.    Xiong Authorized The Transport Of *Le Nez* To Paris For The Giacometti Exhibition

132.    From June 2023 to September 2023, the Giacometti Foundation communicated extensively with Xiong regarding the plan for the exhibition, including the duration of the exhibition, the transport of *Le Nez* from Singapore to Paris, and insurance for *Le Nez*.  Xiong served as the point person for these discussions.

133.    Sun was aware that Xiong was coordinating with the Giacometti Foundation, and was further aware that she had arranged for the transport of *Le Nez* from Singapore to Paris.

134.    In July 2023, the Giacometti Foundation specifically sought, and obtained, Xiong's "agreement" as to logistics regarding *Le Nez*.

135.    On September 18, 2023, Xiong formally authorized the release of *Le Nez* to the Giacometti Foundation from Singapore to Paris.

C.    **The Giacometti Foundation Promoted The *Le Nez* Exhibition As Being Done "In An Exceptional Partnership With APENFT Foundation"**

136.    *Le Nez* was exhibited by the Giacometti Foundation in Paris from around October 2023 to January 2024.

137.    The Giacometti Foundation promoted and offered tickets for the exhibition on its website.  In the promotion, the Giacometti Foundation wrote that "[t]he exhibition is organized in an exceptional partnership with APENFT Foundation" as well as TRON, the blockchain provider for Apenft.  The promotion did not mention Sun's name.[40]

138.    The following is an image that accompanied the promotion on the Giacometti Foundation's website, corroborating the partnership with Apenft—noted right next to the name of the Giacometti Foundation—and similarly lacking any mention of Sun:

---

[40] *See* https://www.fondation-giacometti.fr/en/event/283/alberto-giacometti-the-nose.



Alberto Giacometti. Le Nez, 1947 (version 1949). Fondation Giacometti © Succession Alberto Giacometti / Adagp, Paris 2023

139.   Sun was aware of *Le Nez*'s movements from Singapore to Paris at the direction of Xiong and of its exhibition by the Giacometti Foundation in partnership with Apenft.

## V.   SUN DECIDED THAT APENFT SHOULD SELL *LE NEZ*—AND DIRECTED XIONG TO FIND A BUYER

### A.   After His Purchase And Donation of *Le Nez*, Sun's Net Worth Declined

140.   Upon information and belief, most of Sun's net worth consists of cryptocurrency assets.

141.   In 2021, the year that Sun purchased *Le Nez*, the market for cryptocurrency assets experienced a boom, and Sun's net worth increased.

142.    Throughout 2022 and 2023, however, the crypto market took a downturn.  During that time, Sun's crypto assets decreased in value.

143.    Making matters worse, in November 2023 hackers stole at least $115 million from HTX exchange and Heco Chain, two cryptocurrency platforms owned, directly or indirectly (and in whole or in part), by Sun.[41]

144.    Upon information and belief, Sun's net worth decreased in 2022 and/or in 2023.

145.    Upon information and belief, around November or December 2023, Sun was seeking additional liquidity.

**B.    Sun Authorized Xiong To Sell *Le Nez* And Other Works Of Art**

146.    By December 2023, Sun tasked Xiong with finding a buyer for *Le Nez*.

147.    Just as the crypto market experienced a decline in 2023 compared to 2021, the art market was experiencing a slowdown in 2023 compared to 2021.  Accordingly, Sun and Xiong recognized that *Le Nez* might not sell at auction for the same amount that Sun purchased it in 2021, and they instead sought to sell *Le Nez* privately.

148.    Sun founded Apenft, dominates it, and controls it.  It is his alter ego.  Accordingly, because of his control of Apenft, Sun was able to sell its assets, including *Le Nez*, and keep the proceeds for himself.  That is what he determined to do with *Le Nez*.

149.    Sun thus told Xiong to find a buyer for *Le Nez*, and she did exactly that.

**C.    On Sun's/Apenft's Behalf, Xiong Used The Tunkls To Find A Buyer For *Le Nez***

150.    David Tunkl, principal of the company Ganymede International, Inc., and his son, Cole Tunkl, are Los Angeles-based art dealers.

---

[41] https://www.cnbc.com/2023/11/23/htx-heco-chain-crypto-hack-115-million-stolen-so-far.html.

151.    Xiong met Cole Tunkl in or about the Spring of 2023. Since that time, Xiong consulted with Cole in connection with her personal and professional activities in the arts, including as an agent for both Apenft and Sun.

152.    In or around November 2023, Xiong informed Cole that she and Sun, through Apenft, were looking to privately sell *Le Nez*.

153.    Cole, in turn, consulted with his father, David Tunkl, regarding prospective buyers for *Le Nez*.

154.    The Tunkls identified David Geffen as a potential buyer for *Le Nez*.

**D.    The Parties Entered Into The Exchange Transaction And The Sun Side Letter**

155.    Ultimately, Geffen, Ithaka Trust, Apenft, and Sun agreed on an exchange transaction: Apenft would convey *Le Nez* to Geffen; Geffen, in turn, would convey the Two Paintings together with $10.5 million to Apenft (the "Exchange Transaction").

156.    Geffen did not personally negotiate the Exchange Transaction. Instead, he used an intermediary.

157.    Similarly, Sun did not personally negotiate the Exchange Transaction. Instead, he likewise used an intermediary: his self-proclaimed "liaison to the art world," Xiong.

158.    Xiong, on Sun's and Apenft's behalf, also utilized an individual named Laura Chang in connection with the transaction.

159.    The use of intermediaries to negotiate art transactions is commonplace in the art industry.

160.    Geffen's principal intermediary was his personal outside counsel: an accomplished attorney at an international law firm specializing in the representation of high-net-worth individuals.

161.    The Tunkls, among other things, acted as art dealers who had (i) connected a seller (*i.e.*, Sun/Apenft) and (ii) a buyer (*i.e.*, Geffen/Ithaka).  Sun and Apenft also used the Tunkls to find a buyer for the Two Paintings.  In fact, even before the Exchange Transaction had closed, Xiong and Sun instructed the Tunkls to try to find a buyer for the Two Paintings, so that they would know for sure that the Two Paintings could be sold at their desired price.

162.    For example, on December 14, 2023, Xiong sent the following WhatsApp message to Cole:



163.    Upon information and belief, on or about December 14, 2023, Sun had a phone call with Xiong concerning the potential sale of *Le Nez* and/or the Two Paintings.

164.    Upon information and belief, on or about December 14, 2023, Xiong had a phone call with one or more lawyers working for Sun concerning the potential sale of *Le Nez* and/or the Two Paintings.  Those lawyers' phone records and/or emails will confirm that call.

165.    Upon information and belief, in December 2023, Xiong had a phone call with Sun and/or one or more lawyers working for Sun concerning the potential sale of *Le Nez*.

166.    Upon information and belief, in December 2023, Xiong had a phone call with Sun and/or one or more lawyers working for Apenft concerning the potential sale of *Le Nez*.

167.    Upon information and belief, one or more lawyers working for Sun discussed the potential sale of *Le Nez* with Xiong.

168.    Contrary to Sun's newfound claims, there were no "red flags" during the Exchange Agreement negotiations.  Instead, the record confirmed that Apenft and Xiong were who they claimed to be: Sun's foundation, to which he had donated *Le Nez*; and Sun's and Apenft's art advisor & liaison to the art world, respectively.

169.    In addition, Sun agreed to sign the Sun Side Letter, personally guaranteeing all of the representations and warranties that Apenft was making in the Exchange Agreement.  There was nothing unusual about this side letter: Sun publicly had donated *Le Nez* to Apenft, so asking him to confirm the representations and warranties about the work—in addition to Apenft doing so— was not unusual.  Similarly, on Geffen's side of the deal, both Geffen and Ithaka Trust were guarantors of their side's representations and warranties.

170.    The Sun Side Letter was signed by Sun, Laura Chang, and Xiong.  Geffen had no reason to think Sun's signature was forged, much less any reasons amounting to "red flags."

171.    While Sun, through his new lawyers, now claims that his signature on the Sun Side Letter was forged, Sun admits that, in January 2024, he signed "a letter on behalf of himself

addressed to Geffen, Ithaka, and Lerner [*i.e.*, the Tunkls' attorney] stating that *Le Nez* is free and clear of any liens (the 'Good Title Letter')."  (Complaint ¶ 61.)

172.    Thus, as of January 2024, Sun was aware that Xiong was in discussions with Geffen, Ithaka, and Lerner about a potential sale of *Le Nez.*

## VI.    AFTER THE TRANSACTION, SUN AND XIONG TRIED TO SELL THE TWO PAINTINGS— AND FAILED TO FIND A BUYER AT THE PRICES THEY WANTED

### A.    Sun And Xiong Spent Over One Year Trying To Sell The Two Paintings

173.    The interest of Apenft and Sun in the Two Paintings was for their resale value; they were not interested in holding the Two Paintings or incorporating them into Apenft's collection.

174.    Since before the Exchange Agreement was executed, as early as December 2023, Apenft and Sun, through Xiong as their agent, were seeking to find buyer(s) for the Two Paintings.

175.    As early as December 2023, Sun understood that a well-known art collector named David Martinez was potentially interested in purchasing the Two Paintings.

176.    On December 14, 2023, Sun had a telephonic conversation with Xiong.

177.    Upon information and belief, in that December 14, 2023 conversation, Sun instructed Xiong to ask the Tunkls to obtain a firm commitment from David Martinez regarding his purchase of the Two Paintings.

178.    Xiong proceeded to contact Cole Tunkl that same day, on December 14, 2023, asking about a potential firm commitment from David Martinez.

179.    Unable to secure a buyer for the Two Paintings before the Exchange Agreement was executed, Apenft and Sun, through their agent Xiong, continued searching for a buyer after the Exchange Transaction closed, and throughout nearly all of 2024.

180.    Xiong, on behalf of Apenft and Sun, was in frequent communication with the Tunkls throughout 2024, messaging and/or calling them in each month of 2024—and sometimes on a weekly, or even daily basis—regarding the efforts to secure a buyer for the Two Paintings.

181.    Upon information and belief, from March 2024 (after the $10.5 million payment was made to Sun) through December 16, 2024, Xiong had communications with Sun in which she referenced the Two Paintings.

182.    Upon information and belief, from March 2024 (after the $10.5 million payment was made to Sun) through December 16, 2024, Xiong had communications with Sun in which she referenced the Tunkls.

183.    Upon information and belief, from March 2024 (after the $10.5 million payment was made to Sun) through December 16, 2024, Xiong had communications with Sun in which she referenced the Tunkls' efforts to sell art and thereby obtain cash for Sun and/or Apenft.

184.    Upon information and belief, from March 2024 (after the $10.5 million payment was made to Sun) through December 16, 2024, Xiong shared one or more of her communications with the Tunkls with Sun, including by forwarding (through WhatsApp, text, email or otherwise) one or more of those communications to him.

**B.    Unable To Sell The Two Paintings On Their Desired Terms, Sun & Xiong Explored Fraudulent Means Of Reacquiring _Le Nez_**

185.    Despite their best efforts, the Tunkls were unable to secure buyer(s) for the Two Paintings on the timeline and terms demanded by Sun and Xiong.

186.    Rather than lower their ask price for the Two Paintings, or wait until the market turned and they could find buyers at the prices they wanted, Sun and Xiong instead started scheming for ways to force Geffen to rescind the deal.

187.    For example, in June 2024, David Tunkl informed Xiong that he had found two buyers, one for each of the Two Paintings.  Combined, the buyers were willing to pay $68.5 million for the two works.  But they wanted to pay in installments, starting with a 20% payment in July, with the balances to come by October 2024.

188.    Upon information and belief, Xiong communicated this offer to Sun.

189.    Xiong, acting as agent for Sun and Apenft, rejected this offer.  In her WhatsApp message rejecting the offer, she already started suggesting the idea of rescinding the deal with Geffen, stating: "after half a year waiting, if this is the result I get, can I get Le Nez back and I'd rather not to sell at a loss?"

190.    By November 2024, when no deal for the Two Paintings acceptable to Sun/Apenft had been found, Xiong spoke openly of devising a fraudulent lawsuit to pressure Geffen to rescind the deal.

191.    For example, on a phone call in November 2024 with David Tunkl, Xiong told him that Sun intended to hire litigation attorneys in the United States to file a lawsuit and pressure Geffen into returning *Le Nez*.  Xiong did not identify any breach by Geffen, nor any other legitimate grounds for filing such a lawsuit.  Instead, she asked David Tunkl if he had any ideas for how the lawsuit could be used to pressure Geffen.  David told her that he did not.

C.    **Sun Sent Multiple WhatsApp Messages Showing He Was Aware Of The Exchange Agreement And Then Deleted Them—And His Lawyers Are Now Trying To Rewrite Those Messages**

192.    In a WhatsApp message dated December 17, 2024 (the "December 17 WhatsApp Message"), in a chat involving David Tunkl, Sun wrote that he intended to seek rescission of the Exchange Agreement.  Sun then quickly deleted that message that same day.

193.    In a WhatsApp message dated December 18, 2024 (the "December 18 WhatsApp Message"), Sun wrote to both David and Cole Tunkl that, because of the "prolonged delay," he

was interested in "canceling the deal," wanted to "reclaim the 'Nose' artwork and ship it to our warehouse in Hong Kong." He also indicated that he was prepared to return Geffen's cash.

194.    Because Cole Tunkl knew from his father, David, that Sun had quickly deleted the December 17 WhatsApp Message, and because Cole knew that Xiong had earlier told David that she and Sun were exploring ways to rescind the Exchange Agreement, Cole took and saved a snapshot of the December 18 WhatsApp Message. A copy of that December 18 WhatsApp Message is attached hereto as **Exhibit 2**.

195.    Sun thereafter deleted the December 18 WhatsApp Message just as he had deleted the December 17 WhatsApp Message.

196.    In his complaint, Sun claims that his WhatsApp message was written "in imperfect English." Rather than quote or attach the WhatsApp message, his lawyers attempt to rewrite it for him, using words more favorable to Sun's new narrative:

| WhatsApp Message | Complaint ¶ 97 |
| --- | --- |
| "Due to the prolonged delay in completing the transaction, I suggest *canceling the deal*." | "On December 18, 2024, Plaintiff wrote into the chat (in imperfect English) that he was the owner of *Le Nez* and that he was *canceling any deal negotiation* due to the prolonged delay." |

197.    Sun obtained a Master's Degree from the University of Pennsylvania in 2013 and, upon information and belief, has been speaking English for much of his life. As shown above, Sun wrote that he was canceling "the *deal*," not—as his new lawyers now suggest in their Complaint— "canceling any deal *negotiation*."

198.    Despite Sun's attempt to rewrite the December 18 WhatsApp Message—a message that Sun was forced to admit he deleted before filing this lawsuit—"completing the transaction" meant selling the Two Paintings and netting Sun more cash.

199.    Moreover, Sun's post-litigation claim that he deleted the WhatsApp message "out of concern that [Tunkl] might have been in on the theft" (Complaint ¶ 99) makes no sense: if he really believed he had just identified Xiong's accomplices, Sun would have kept the WhatsApp message and shared it with his attorneys.  He would not have deleted it, hoped it never came to light, and then attempted to rewrite it, hiding behind his purported "imperfect English."

200.    In his Complaint, Sun alleges that he "asked Xiong on December 18, 2024 if she knew what was happening with the purported buyer," claims that "Xiong identified the Tunkls to Plaintiff" that same day, and further claims that Xiong purportedly "confessed her theft of *Le Nez* and fraud to Plaintiff" that same day.  (Complaint ¶¶ 92-98.)  Thus, according to the Complaint, December 18, 2024 was a pretty significant day.

201.    The Complaint's allegations about December 18, 2024 are false.  For example, contrary to Sun's newfound claims, he also sent a WhatsApp message to David Tunkl on December 17, 2024—the day before Xiong's purported confession, and *the day before Xiong purportedly first "identified the Tunkls to Plaintiff."*  Sun deleted that December 17, 2024 WhatsApp Message before he filed this lawsuit.

202.    Furthermore, as noted above, Sun and Xiong schemed to contrive the allegations in this lawsuit, including Xiong's purported "fraud" and "theft."  Xiong did not defraud Sun, nor did she steal from him.  Instead, Xiong agreed to help Sun pursue this bogus lawsuit in his misguided effort to pressure Geffen to rescind the Exchange Transaction.

**VII.    SUN AND XIONG CONCOCTED A FRAUDULENT SCHEME TO OBTAIN *LE NEZ***

**A.    <u>Sun Had A First Set Of Lawyers At Harder Stonerock Send A Demand Letter That Claimed That Xiong Forged Two Signatures On "23 March 2024" Due To "Time Pressure"—And Also Acknowledged That Xiong Had Told Sun About The "$10.5" Million</u>**

203.    Five days after sending the December 18 WhatsApp Message (*i.e.*, on December 23, 2024), Sun's attorneys at Harder Stonerock sent the December Letter to Geffen's general counsel claiming, among other things, that the Exchange Transaction was "fraudulent" and that Apenft never owned *Le Nez*.  A copy of the December Letter is attached hereto as **Exhibit 3**.

204.    Harder Stonerock attached to its December Letter the Xiong Declaration, a purported "Statutory Declaration" by Xiong, dated December 20, 2024.  A copy of the Xiong Declaration is attached hereto as **Exhibit 4**.

205.    The Xiong Declaration was drafted by one or more attorneys working for Sun.

206.    The Xiong Declaration contains one or more false statements.

207.    Upon information and belief, Sun discussed the Xiong Declaration with Steve Liu ("Liu") before Xiong signed it.  Liu is a close friend, associate, and advisor to Sun.

208.    Upon information and belief, Sun discussed the December 17 WhatsApp Message with Liu before he sent it.

209.    Upon information and belief, Sun discussed the December 18 WhatsApp Message with Liu before he sent it.

210.    At the time Xiong signed the Xiong Declaration, Liu was aware that Sun had deleted relevant information about this lawsuit, including the December 18 WhatsApp Message.

211.    Upon information and belief, Sun discussed the Xiong Declaration with Xiong before she signed it.

212.    Upon information and belief, Liu discussed the Xiong Declaration with Xiong before she signed it.

213.    Upon information and belief, Sun—directly and/or through his agents—pressured and/or encouraged Xiong to sign the Xiong Declaration.

214.    As a result of this pressure and/or encouragement, Xiong agreed to declare false facts that she thought would support Sun's claim to rescind the validly entered Exchange Agreement.

215.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with Sun concerning *Le Nez*.

216.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with Sun concerning the Two Paintings.

217.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with Sun concerning the Tunkls.

218.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with Liu concerning *Le Nez*.

219.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with Liu concerning the Two Paintings.

220.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with Liu concerning the Tunkls.

221.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with one or more agents/employees for Sun concerning *Le Nez*.

222.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with one or more agents/employees for Sun concerning the Two Paintings.

223.    Between January 2024 and December 16, 2024, Xiong exchanged multiple electronic communications with one or more agents/employees for Sun concerning the Tunkls.

224.    In December 2024, Sun deleted the December 17 WhatsApp Message and the December 18 WhatsApp Message.

225.    Upon information or belief, in or since December 2024, Sun has deleted other electronic communications concerning the subject matter of this lawsuit.

226.    Harder Stonerock's December Letter contradicts Sun's new lawyers' Complaint in multiple ways.

227.    For example, the December Letter, and the Xiong Declaration it attaches and relies upon, states that Xiong told Sun about the $10.5 million (not only $10 million); (b) asserts that Xiong forged Sun's signature only in March 2024 (not in January 2024); and (c) specifically identifies "time pressure" as the reason for the forgery (not any purported desire to steal $500,000).

228.    Upon information and belief, prior to December 2024, Sun was aware that $10.5 million, not $10 million, had been transmitted in connection with the actual or anticipated transaction involving *Le Nez*.

229.    Upon information and belief, prior to December 2024, Sun had received all $10.5 million, not only $10 million, that had been transmitted in connection with the actual or anticipated transaction involving *Le Nez*.

230.    Upon information and belief, prior to December 2024, Sun was aware that Xiong had kept approximately $500,000 of the $10.5 million that had been transmitted in connection with the actual or anticipated transaction involving *Le Nez*.

231.    Upon information and belief, Sun allowed Xiong to keep approximately $500,000 of the $10.5 million that had been transmitted in connection with the actual or anticipated transaction involving *Le Nez*.

232.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date his Complaint was filed), Sun had not demanded that Xiong return the $500,000.

233.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not demanded that Xiong return the $500,000.

234.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date his Complaint was filed), Xiong had not returned the $500,000.

235.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Xiong still has not returned the $500,000.

236.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date his Complaint was filed), Sun had not filed any police report claiming that Xiong stole from him.

237.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed any police report claiming that Xiong stole from him.

238.    Upon information and belief, since December 17, 2024, Sun and/or entities he owns or controls have paid money to Xiong, directly and/or through intermediaries.

239.    Upon information and belief, Xiong did not physically type the Xiong Declaration.

240.    Upon information and belief, someone other than Xiong typed the Xiong Declaration for her.

241.    Upon information and belief, an attorney for Sun typed Xiong's purported Xiong Declaration.

242.    Upon information and belief, one or more employees of a law firm working for Sun typed Xiong's purported Xiong Declaration.

243.    Upon information and belief, Xiong also did not choose many of the words, phrases, and/or verbiage in the Xiong Declaration.  Instead, Sun's attorneys/employees/agents not only typed the Xiong Declaration but also drafted some or all of its language.

244.    Upon information and belief, the narrative in Xiong's purported Xiong Declaration was hastily concocted before further careful consideration, causing numerous inconsistencies with the public record, private communications, and with Sun's very own Complaint in this lawsuit.

245.    In multiple lawsuits filed against Sun in the years before Xiong's purported Xiong Declaration, former employees alleged that Sun is a vengeful boss who would physically abuse employees, causing fear among other employees that they, too, would be physically assaulted and verbally abused by Sun if they did not comply with Sun's "unethical and/or illegal business activities."  *See, e.g.*, Complaint, *Zhimin v. Rainberry Inc., et al.*, No. CGC-21-595792 (Ca. Sup. Ct. Oct. 5, 2021); Complaint, *Hall, et al. v. Rainberry Inc., et al.*, No. CGC-19-580304 (Ca. Sup. Ct. Oct. 28, 2019).

246.    Upon information and belief, Xiong feared the consequences of failing to attest to the narrative set forth in the purported Xiong Declaration.

**B.**    **Geffen Responded To The December Letter And Requested That Sun Answer Basic Questions And Produce Basic Documents**

247.    On January 24, 2025, Geffen's counsel at Nagy Wolfe Appleton LLP ("NWA") sent a letter responding to Sun's December Letter.  In that response letter, NWA identified multiple inconsistencies in the December Letter.  NWA also asked Sun's counsel to answer a list of "basic

questions" and to produce basic documents concerning Sun's claims.  For example, NWA asked Sun's counsel to produce Sun's relevant communications with Xiong.  A copy of the letter (the "NWA Letter") is attached hereto as **Exhibit 5**.

248.    NWA also noted that, in the December Letter, Harder Stonerock stated that "[a] police report regarding this matter has been filed with law enforcement in Beijing, China, and Mr. Sun's representatives are in the process of preparing a report for the Federal Bureau of Investigation, as well as the appropriate filings with the Art Claim Database and other art recovery services, including the Art Loss Register and Art Recovery International."  December Letter at 1. In response, NWA noted that Sun's "recent version of events is false," and asked that, "[i]f your client has made any such reports or filings, please let us know so we can contact each relevant party and correct the record."  NWA Letter at 8.

249.    Sun chose not to respond to the NWA Letter: he did not produce a single one of the basic documents Geffen requested, did not answer a single one of the basic questions Geffen's attorneys posed, did not provide a copy of the purported "police report" he claimed to have filed, and did not state whether or not he had contacted the FBI, Art Claim Database, Art Loss Register and Art Recovery International.  Instead, Sun rushed to file his bogus lawsuit—which was his plan all along.

250.    Had Sun really been the victim of a crime, he would have responded to most or all of Geffen's questions and provided most or all of the documents Geffen requested.

251.    Upon information and belief, as of December 23, 2024 (*i.e.*, the date of the December Letter), Sun had not filed a police report with law enforcement in Beijing, China.

252.    Upon information and belief, as of December 23, 2024 (*i.e.*, the date of the December Letter), Sun had not filed a police report with law enforcement in any other jurisdiction, either.

253.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date of his Complaint), Sun had not filed a police report with law enforcement in Beijing, China.

254.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date of his Complaint), Sun had not filed a police report with law enforcement in any other jurisdiction, either.

255.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed a police report with law enforcement in Beijing, China.

256.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed a police report with law enforcement in any other jurisdiction, either.

257.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date of his Complaint), Sun had not filed any report with the FBI, as he claimed in the December Letter he intended to do.

258.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date of his Complaint), Sun had not filed any report with the Art Claim Database, as he claimed in the December Letter he intended to do.

259.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date of his Complaint), Sun had not filed any report with the Art Loss Register, as he claimed in the December Letter he intended to do.

260.    Upon information and belief, as of February 4, 2025 (*i.e.*, the date of his Complaint), Sun had not filed any report with Art Recovery International, as he claimed in the December Letter he intended to do.

261.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed any report with the FBI, as he claimed in the December Letter he intended to do.

262.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed any report with the Art Claim Database, as he claimed in the December Letter he intended to do.

263.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed any report with the Art Loss Register, as he claimed in the December Letter he intended to do.

264.    Upon information and belief, as of April 16, 2025 (*i.e.*, the date of Geffen's Answer & Counterclaims), Sun still has not filed any report with Art Recovery International, as he claimed in the December Letter he intended to do.

C.    **Sun's Fraudulent Scheme Is Consistent With A Broader Pattern Of Fraudulent Behavior**

265.    Sun's present scheme to reclaim *Le Nez* is part of a broader tendency to engage in fraud and deception.

266.    For example, Sun's founding of TRON—his initial foray into the crypto space—was reportedly based on a plagiarized whitepaper.  Sun apparently copied, without referencing, whitepapers written by Protocol Labs, the creator of both IPFS and Filecoin.  Extended portions

of the TRON whitepaper closely mirrored text from either the IPFS or Filecoin whitepapers, including its descriptions of specific strategies and even specific charts and formulas.[42]

267.    After the plagiarism allegations surfaced, Sun deleted the whitepaper from TRON's website.[43]

268.    As noted above, Sun was later sued by the SEC for fraud—in connection with his "orchestration of the unregistered offer and sale, manipulative trading, and unlawful touting of crypto asset securities," including the fraudulent practice of "wash trading."[44]  The SEC dropped its case only after Sun made a $30 million donation to President Trump's cryptocurrency company, World Liberty Financial.

269.    Sun also made multiple false statements in his Former Employee Suits, including falsely claiming diplomatic immunity in connection with his terminated ambassadorship to Grenada in order to avoid having to sit for a deposition—leading one of the courts to issue terminating sanctions for his misconduct.[45]  A copy of the Terminating Sanctions Order is attached hereto as **Exhibit 6**.

270.    As noted above, those Former Employee Suits alleged that Sun physically abused his employees and punished them for refusing to engage in his "unethical" and "illegal" activities.[46]

271.    Sun is now continuing his pattern of fraudulent, coercive, and sanctionable misconduct here.  Geffen brings these counterclaims to clear title to *Le Nez* and to ensure Sun pays for the damages caused by his misconduct.

---

[42] *See, e.g.*, https://www.ccn.com/trons-whitepaper-appears-plagiarize-filecoin-ipfs/;
https://coincentral.com/community-accuses-tron-plagiarizing-whitepaper/.
[43] *Id.*
[44] *See supra* n. 1.
[45] https://protos.com/scoop-justin-sun-falsely-claimed-diplomatic-immunity-in-lawsuit/.
[46] *See supra* Paragraph 245.

### D.    Geffen Is Entitled To Attorneys' Fees Pursuant To The Exchange Agreement

272.    The Exchange Agreement is a valid and binding agreement between, *inter alia*, Counterclaim Plaintiffs and Apenft.

273.    The Exchange Agreement includes a clause stating: "provided however, that a document that references this Agreement, and is signed by a party to this Agreement and by any other person, shall be deemed to be an amendment to this Agreement, shall be enforceable against the signatories to such document as if such document was incorporated in this Agreement by reference."  Under this term, Sun became bound by the Exchange Agreement by signing the Sun Side Letter, the First Amendment and/or the Authorization Agreement.

274.    Moreover, Sun also is bound by the Exchange Agreement because Apenft is his alter ego.  Sun founded, dominates, owns and controls Apenft.  Among other things, Sun publicly has promised to donate hundreds of millions of dollars of art and other assets to Apenft, yet in this lawsuit—while acknowledging these public promises—now declares that he can break those commitments willy nilly.  Sun also purportedly has transferred ownership of Apenft to his step-mother.

275.    Sun also is personally bound by the terms of the Exchange Agreement by the acts of Xiong, who executed the contract as his agent and with the express and/or implied and/or apparent authority to bind him; and by Apenft, which (as noted above) is Sun's alter ego.

276.    Counterclaim Plaintiffs performed all of their obligations under the Exchange Agreement.

277.    Sun manifested satisfaction with Counterclaim Plaintiffs' performance by, among other things, assenting to the conveyance of *Le Nez* to Counterclaim Plaintiffs, and by retaining without complaint (and for nearly a year) Counterclaim Plaintiffs' payments under the Exchange

Agreement, including (i) over $10,000,000 delivered to his personal bank accounts and/or virtual wallets and (ii) the Two Paintings to the designated art dealers.

278.    Accordingly, Sun is bound by the Exchange Agreement.

279.    The Exchange Agreement provides that "[i]f any party institutes or defends a lawsuit, or other legal proceeding to enforce, or because of breach of, the terms and conditions of this Agreement, the prevailing party or parties shall be reimbursed, upon demand, by the other party or parties, for the costs and expenses, including without limitation reasonable attorneys' fees and costs of bringing or defending such law suit or other legal proceeding."

280.    Geffen is therefore entitled to the costs and expenses he incurs in connection with this action, including without limitation reasonable attorneys' fees.   Geffen separately and independently also is entitled to attorneys' fees and costs due to the frivolous and fraudulent nature of Sun's claims.

## CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT

281.    Counterclaim Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 280 as if fully set forth herein.

282.    An actual and justiciable controversy exists between Counterclaim Plaintiffs and Sun.  Counterclaim Plaintiffs are the rightful owners of *Le Nez*.  Sun wrongfully and fraudulent has claimed that Counterclaim Plaintiffs never took good title to *Le Nez* and seeks to recover *Le Nez* in this Action.  A declaration that Counterclaim Plaintiffs took good title to *Le Nez*, and thus that Sun cannot recover it, is appropriate to fully and finally to resolve the question of ownership of *Le Nez* that Sun fraudulently has contrived in this lawsuit.  This case is therefore ripe for declaratory relief pursuant to 28 U.S.C. § 2201(a).

283.    Geffen respectfully requests a declaratory judgment that:

    a.    The Exchange Agreement is a valid and binding agreement that conveyed *Le Nez* to Geffen.

    b.    Sun's claims that the Exchange Agreement was procured by Xiong's purported fraud are without merit—and are themselves a fraud upon Geffen and this Court.

    c.    Geffen, not Sun, is the rightful owner of *Le Nez*.

284.    Alternatively, Geffen respectfully requests a declaratory judgment that he is a bona fide purchaser and/or a good-faith purchaser for value under Section 2-403 of the Uniform Commercial Code, and rejecting all of Sun's claims for that reason.

## COUNT II: QUIET TITLE

285.    Counterclaim Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 280 as if fully set forth herein.

286.    *Le Nez* is located in this District.  This Court has authority to remove any cloud upon its title pursuant to 28 U.S.C. § 1655.

287.    Counterclaim Plaintiffs are entitled to an order removing the cloud upon their valid title to *Le Nez* that exists because of Sun's contrived claims asserted in this Action, and quieting Counterclaim Plaintiffs' title to *Le Nez*.

## DEMAND FOR JURY TRIAL

288.    Counterclaim Plaintiffs demand a jury trial on all issues triable to a jury, including on all of Sun's claims and on all of their counterclaims.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs respectfully request that the Court award the following relief:

a. That the Court enter a declaratory judgment against Sun stating that Counterclaim Plaintiffs took good title to *Le Nez*, free and clear of any claim by Sun to *Le Nez* or against Counterclaim Plaintiffs;

b. That the Court enter an order and judgment *in rem* pursuant to 28 U.S.C. §§ 1655 and 2201 that Counterclaim Plaintiffs are the rightful owners of *Le Nez*;

c. All damages to which Counterclaim Plaintiffs are entitled, including all of their attorneys' fees and costs associated with this lawsuit;

d. All pre- and post-judgment interest to which Counterclaim Plaintiffs are entitled;

e. All costs and expenses to which Counterclaim Plaintiffs are entitled, including, without limitation, attorneys' fees and costs under the Exchange Agreement; and

f. All other relief such as the Court may deem just and proper under the circumstances.

Dated: New York, New York
       April 16, 2025

Respectfully submitted,

  /s/  Tibor L. Nagy, Jr.
**NAGY WOLFE APPLETON LLP**
Tibor L. Nagy, Jr.
Gregory N. Wolfe
Arian Soroush
31 East 62nd Street
New York, NY 10065
Tel: (646) 494-4900
tibor@nagylaw.com
greg@nagylaw.com
asoroush@nagylaw.com

*Attorneys for Defendants and*
*Counterclaim Plaintiffs*