UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
YUCHEN JUSTIN SUN,

       Plaintiff and Counterclaim Defendant,

             -against-

DAVID GEFFEN and ITHAKA
TRUST,

       Defendants and Counterclaim Plaintiffs.

             -and-

*LE NEZ*, a sculpture,

       Defendant-in-rem.

-------------------------------------------------------------X

**25 Civ. 995 (AT) (GS)**

**OPINION & ORDER**

**GARY STEIN, United States Magistrate Judge:**

On March 17, 2026, Defendants and Counterclaim Plaintiffs David Geffen and Ithaka Trust ("Geffen") filed a letter-motion to compel production of certain emails over which Plaintiff and Counterclaim Defendant Yuchen Justin Sun ("Sun") has asserted attorney-client privilege. (Dkt. No. 119). For the reasons stated below, Geffen's letter-motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This discovery dispute arises from a non-party subpoena issued by Geffen to the law firm Loeb & Loeb LLP ("Loeb"), which represented Sun in connection with the events at issue in this case. Following consultation with Sun's litigation counsel, Loeb withheld from production, on grounds of attorney-client privilege, a series of emails from December 2023 to January 2024 between or among Zhihong

(Steven) Liu ("Liu"), Sydney Xiong ("Xiong"), and Robert Caldwell ("Caldwell"), a Loeb attorney (the "Withheld Emails"). The Withheld Emails consist of two chains. The first chain contains emails between Liu and Caldwell dated from December 20 to December 21, 2023 and are labeled as "PRIV_01" and "PRIV_02" in Loeb's privilege log (the "Liu Emails"). (Dkt. No. 119 Ex. 1 at 1). The next set of emails involves a chain among Xiong, Caldwell, and Liu from December 22, 2023, to January 2, 2024, and are identified as "PRIV_03" through "PRIV_08" in the privilege log (the "Xiong Emails"). (*Id.* Ex. 1 at 1–2).

Xiong is a key player in the drama underlying this action. Sun alleges that Xiong, Sun's "former employee," "stole" *Le Nez*, an Alberto Giacometti sculpture purchased by Sun in 2021, by causing it to be sold to Geffen without Sun's authorization. (*See* Dkt. No. 1 ("Complaint") ¶¶ 1–12). Sun claims that Xiong did this by falsely identifying a Singapore-based entity known as APENFT Foundation Ltd. ("APENFT") as the owner of *Le Nez*, and forging Sun's signature on purported deal documents on behalf of APENFT. (*Id.* ¶¶ 3, 5). Geffen, on the other hand, alleges that Xiong, in her capacity as Sun's "personal art advisor and APENFT's artistic director," entered into a valid exchange agreement to sell *Le Nez* through APENFT, Sun's "alter ego," to Geffen in January 2024. (Dkt. No. 20 ("Answer and Counterclaims") ¶¶ 8–9, ¶¶ 146–49). Geffen claims that Xiong did this with Sun's full authorization and that Sun and Xiong then "contrived this fraudulent lawsuit, hoping to pressure Geffen into rescinding the deal or paying Sun." (*Id.* ¶ 1).

Liu serves "in various capacities for multiple entities" affiliated with Sun.

2

(Dkt. No. 127 Ex. A ("Liu Decl.") ¶ 1). He also represents Sun "in [Sun's] individual capacity for various matters." (*Id.*). Caldwell, who is based in Loeb's Hong Kong office, is Sun's "long-time transactional counsel." (Dkt. No. 127 at 1). Sun is not copied on any of the Withheld Emails. (Dkt. No. 119 Ex. 1 (privilege log)).

After Loeb received Geffen's subpoena, Sun's counsel and Geffen's counsel met and conferred about Loeb's privilege assertions. (Dkt. No. 127 at 2–3). In those discussions, Sun took the position that, although Sun himself is not a party to the Withheld Emails, Liu and Xiong were acting as his agents in communicating with Loeb and the Withheld Emails therefore are protected by the so-called "agency privilege." (Dkt. No. 119 at 1; Dkt. No. 127 at 3).

In his letter-motion, Geffen argues that the Withheld Emails are not privileged. (Dkt. No. 119). Geffen notes that Sun (through Loeb) produced "multiple other emails between Xiong and Caldwell" regarding the *Le Nez* sale, including emails from January 15–17, 2024 that are part of the same chain as the Xiong Emails. (*Id.* at 2). Geffen disputes Sun's "subjective" delineation of the privilege, whereby Sun claims that Xiong was still in "the tent" of the attorney-client privilege until January 15, 2024, thereby allowing withholding of pre-January 15 emails, after which she allegedly "went rogue." (*Id.*). Further, Geffen argues that Sun's reliance on the agency privilege is unavailing because "Sun relies on nothing more than the agency relationship itself" to assert privilege, rather than also establishing that "disclosure to the agent 'was necessary for the client to obtain

3

informed legal advice.'" (*Id.* at 3 (citation omitted)).

In his response, Sun argues that Hong Kong privilege law should apply, and that under Hong Kong law, "confidential communications between a client and his solicitor (lawyer) acting in his professional capacity, made through a representative of the client in order to convey information to or from the lawyer, are privileged." (Dkt. No. 127 at 2). But Sun also argues that New York law "similarly recognizes an 'agency privilege'" that protects the Withheld Emails. (*Id.*). Sun contends that prior to Xiong's "fraud and theft," "Sun had Xiong and [Liu] meet with Caldwell" to discuss Sun's interest in selling *Le Nez*, and that "Liu and Xiong were necessary to Caldwell receiving information" so that Caldwell could render legal advice to Sun. (*Id.*). Sun claims that at all times, Liu was "speaking as Sun's representative and thus covered by an 'agency' privilege." (*Id.* at 3). Similarly, Xiong also spoke to Caldwell as Sun's representative and was thus "equally covered by an agency privilege [] up to the point where she stopped copying Liu and began engaging in rogue and fraudulent activities that were no longer expressed on Sun's behalf, at which point her communications could no longer be deemed covered by an agency privilege." (*Id.*).

In support of his position, Sun submitted a declaration from Liu. According to Liu, because Sun "maintains significant and expansive business interests," Sun relies on Liu, among other representatives, to advise Sun on "his business and legal affairs." (Liu Decl. ¶ 2). Liu claims that he "routinely communicate[s] with Mr. Sun's lawyers as his representative" based on the understanding that "all such

4

communications by and with me are strictly confidential and privileged for the benefit of Mr. Sun." (*Id.* ¶ 3).  Liu then states that he introduced Xiong, as Sun's "representative . . . in her capacity as [Sun's] art adviser," to Caldwell to provide information about *Le Nez*, and that Liu understood Xiong's communications on the subject to be "strictly confidential and privileged" for Sun's benefit.  (*Id.* ¶ 6). Lastly, Liu's declaration states that he "c[a]me to learn" that around January 2024, Xiong communicated with Caldwell without copying Liu concerning a "purported deal for *Le Nez* that Mr. Sun never authorized."  (*Id.* ¶ 7).

With the Court's permission (Dkt. No. 134), Geffen submitted a reply letter on April 7, 2026.  (Dkt. No. 136).  There, Geffen argues that "where the proponent of privilege has failed to show any material conflict of law," New York privilege law should apply.  (*Id.* at 1).  Next, Geffen asserts that under either New York or Hong Kong law, the agency privilege does not apply.  (*Id.* at 2).  Geffen further claims that the content of the Withheld Emails is not "inherently legal" and must therefore be produced.  (*Id.*).  Lastly, Geffen asserts that Sun waived privilege when he made a "tactical decision to disclose some privileged emails on a given subject matter while keeping others withheld," pointing to the fact that the produced emails between Xiong and Caldwell are on the same chain as the withheld Xiong Emails.  (*Id.* at 3).

After receiving the parties' submissions, the Court issued an order requiring Sun to "direct Loeb & Loeb to submit the disputed emails for the Court's *in camera* review."  (Dkt. No. 138 at 2).  Loeb sent the privileged documents for the Court's *in camera* review on April 17, 2026.  The Court thereafter held oral argument on

5

Geffen's motion on May 21, 2026.  (Dkt. No. 181, Transcript of Proceedings ("Tr.")).

At oral argument, Sun shifted his position somewhat.  Sun's counsel stated that, while Sun maintains that *Liu* acted as Sun's agent and representative (Tr. at 45:16–22, 54:2–3), Sun is *not* contending that *Xiong* acted as Sun's agent or directly as Sun's representative.  (Tr. at 47:3–9 ("THE COURT: -- is it your position that, in these communications with Caldwell, Xiong was acting as Sun's agent?  [SUN'S COUNSEL]: No.  THE COURT: Is it your position that, in these communications with Caldwell, Xiong was acting as Sun's representative?  [SUN'S COUNSEL]: Indirectly, tangentially, through Liu, yes."); *compare* Dkt. No. 127 at 3 (Sun asserting in his letter response that "Xiong was speaking as Sun's representative (and thus . . . covered by an agency privilege) up to the point that she [went rogue]")).  Similarly, although maintaining that Sun sent *Liu* to deal with Caldwell (Tr. at 44:20–24), Sun's counsel acknowledged that there is no evidence that Sun directed or asked *Xiong* to speak with Caldwell, or that Sun even knew that Xiong was communicating with Caldwell.  (Tr. at 45:4–10; *compare* Dkt. No. 127 at 2 (Sun asserting in his letter response that "Sun had Xiong and another of his representatives, Steven Liu ('Liu'), meet with Caldwell in late 2023")).

Instead, Sun argued that the Xiong Emails are cloaked by the privilege because Xiong could be likened to a "consulting expert to attorneys."  (Tr. at 40:7–9, 43:16–20).  According to Sun, Xiong was "necessary to helping [Caldwell] understand how to paper this deal" because Liu, in his capacity as Sun's agent, did not "operate in the art industry" and needed someone who did, so that Caldwell

6

could understand what he needed "to make the deal happen from a legal perspective." (*Id.* at 40:18–41:19, 43:16–25, 44:2–3). Therefore, Sun is "invok[ing] the agency privilege because Steve Liu was Justin Sun's agent" and when Xiong was "brought into" the same "confidential tent" by Liu, "that same expectation of confidentiality applied." (*Id.* at 48:8–18).[1]

**LEGAL STANDARDS**

### A. Choice of Law

"A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). New York law requires determining whether there is an "actual conflict between the laws of the jurisdictions involved." *Id.* (citations omitted). Absent an actual conflict, "New York law governs claims of privilege" for New York federal courts sitting in diversity jurisdiction. *Narayanan v. Sutherland Glob. Holdings Inc.*, 285 F. Supp. 3d 604, 611 n. 4 (W.D.N.Y. 2018); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006). "[T]he burden of identifying a conflict of law is on the party asserting the application of foreign law." *Shah v. Kuwait Airways Corp.*, No. 08 Civ. 7371 (JAP) (JCF), 2012 WL 3055652, at *1 (S.D.N.Y. July 26, 2012).

### B. Attorney-Client Privilege

The attorney-client privilege protects from disclosure "(1) a communication between client and counsel that (2) was intended to be and was in fact kept

---

[1] Sun also confirmed at oral argument that Caldwell's sole client in connection with the Withheld Emails was Sun himself, and not any other individual or entity. (Tr. at 37:18–38:4).

7

confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). "The privilege protects both the advice of the attorney to the client and the information communicated by the client that provides a basis for giving advice." *Johnson v. J. Walter Thompson U.S.A., LLC*, No. 16 Civ. 1805 (JPO) (JCF), 2017 WL 3432301, at *2 (S.D.N.Y. Aug. 9, 2017). "However, '[b]ecause the privilege shields from disclosure pertinent information and therefore constitutes an obstacle to the truth-finding process, it must be narrowly construed.'" *Shih v. Petal Card, Inc.*, 565 F. Supp. 3d 557, 566 (S.D.N.Y. 2021) (quoting *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624, 36 N.Y.S.3d 838, 57 N.E.3d 30 (2016)).

"Generally, the presence of a third party, or the voluntary disclosure of privileged communications to a third party, destroys the privilege because the third-party's knowledge of the communication undermines the notion that 'the communication was intended to be, and actually was, kept confidential.'" *Richards v. Kallish*, No. 22 Civ. 9095 (CS) (VR), 2023 WL 8111831, at *6 (S.D.N.Y. Nov. 22, 2023) (quoting *United States v. Mejia*, 655 F.3d 126, 134 (2d Cir. 2011)). However, there are exceptions to this general rule. Relevant here is an exception referred to as "the agency privilege," *Guiffre v. Maxwell*, No. 15 Civ. 7433 (RWS), 2016 WL 1756918, at *5 (S.D.N.Y. May 2, 2016), or the "agency exception," *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85, 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999). Under this doctrine, "where a third party is present during attorney-client communications, as either the party's or the attorney's agent, in

order to facilitate rendition of legal services, the protection of the privilege remains intact.'" *Bulgari v. Bulgari*, 649 F. Supp. 3d 8, 10 (S.D.N.Y. 2023) (quoting *Oxyn Telecommunications, Inc. v. Onse Telecom*, No. 01 Civ. 1012 (JSM), 2003 WL 660848, at *2 (S.D.N.Y. Feb. 27, 2003)); *see also People v. Osorio*, 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 549 N.E.2d 1183 (1989) ("[C]ommunications made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication, generally will be privileged.").

To avail itself of the "agency" exception, the party claiming privilege "'must establish' both a 'reasonable expectation of confidentiality' and 'that disclosure to a third party . . . was necessary for the client to obtain informed legal advice.'" *Bulgari*, 649 F. Supp. 3d at 11–12 (quoting *Nat'l Educ.*, 1999 WL 378337, at *4). A client's "subjective belief that an attorney-client communication will remain confidential" is necessary, but insufficient, to establish a *"reasonable* expectation of confidentiality." *Nat'l Educ.*, 1999 WL 378337, at *4 (emphasis in original). To qualify as necessary, the involvement of the third party must be "nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 103 (S.D.N.Y. 2007) (quotation omitted). "[W]here the third party's presence is merely useful but not necessary, the privilege is lost." *Id.* at 104 (cleaned up).

An example or variant of the agency privilege, sometimes called the "translator exception," *see United States v. Anthem, Inc.*, No. 20 Civ. 2593 (ALC) (KHP), 2025 WL 2426482, at *4 (S.D.N.Y. Aug. 22, 2025), originates with the

Second Circuit's decision in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961).  The *Kovel* doctrine recognizes that "the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client."  *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). While the agency privilege applies more generally to third-party involvement necessary for the rendition of legal services, the particular focus of *Kovel* is on situations where the third party (such as the accountant in *Kovel*) "play[s] a role analogous to an interpreter" in facilitating communications between the client and attorney.  *Id.*; *see Kovel*, 296 F.2d at 922.

The party who invokes the attorney-client privilege "'bears the burden of establishing its essential elements.'"  *In re Actos Antitrust Litig.*, 703 F. Supp. 3d 468, 471 (S.D.N.Y. 2023) (quoting *Mejia*, 655 F.3d at 132).  "This burden can be met only by an evidentiary showing based on competent evidence . . . and cannot be 'discharged by mere conclusory or ipse dixit assertions.'"  *EFCG, Inc. v. AEC Advisors, LLC*, No. 19 Civ. 8076 (RA) (BCM), 2020 WL 6378943, at *3 (S.D.N.Y. Oct. 30, 2020) (quoting *Bowne of New York City v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993)).

## C.  Waiver

"In the case of the attorney-client privilege, 'if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication over which the privilege is claimed,' the privilege is waived."

10

*Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (CM) (KHP), 2019 WL 1259382, at *6 (S.D.N.Y. Mar. 19, 2019) (quoting *Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 102 (S.D.N.Y. 2000)).  "When there has been a selective disclosure of attorney-client communications in the litigation, courts typically find the party has waived privilege as to all documents pertaining to the subject disclosed." *Id.* at *7.  That is because "it is unfair for [a] party in a litigated controversy to . . . use th[e] privilege as both a sword and a shield, to waive when it enures to her advantage, and wield when it does not." *In re N.Y. City Asbestos Litig.*, 109 A.D.3d 7, 13, 966 N.Y.S.2d 420, 424 (1st Dep't 2013) (citation omitted); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword.").

"Whether fairness requires disclosure [is] decided by the courts on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." *In re Grand Jury Proc.*, 219 F.3d 175, 183 (2d Cir. 2000).  The party invoking the attorney-client privilege has the burden of showing that the privilege has not been waived. *In re Actos Antitrust Litig.*, 703 F. Supp. 3d at 471; *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 86 (S.D.N.Y. 2019).

## DISCUSSION

### A.  The Court Will Apply New York Law

Sun claims that "Geffen inappositely relies" on New York privilege law and that Hong Kong law applies. (Dkt. No. 127 at 2).  Geffen argues in response that Sun failed to sustain his burden to show that there is a "material conflict" between

11

Hong Kong and New York privilege law. (Dkt. No. 136 at 1). The Court agrees with Geffen. While Sun provides a string cite to Hong Kong cases that he contends recognize an agency exception, Sun offers no support for a finding that Hong Kong privilege law is materially different in this regard from New York law. (*See* Dkt. No. 127 at 2). To the contrary, Sun admits that New York law "similarly recognizes an 'agency privilege.'" (*Id.*). Because Sun has failed to explain why Hong Kong privilege law should apply, the Court will apply New York privilege law to this dispute. *See Shah*, 2012 WL 3055652, at *1 ("[B]ecause Plaintiff failed to carry her burden in identifying [a material conflict of law], the Court . . . must apply the law of the forum state, New York.").

## B. The Liu Emails Are Protected by Attorney-Client Privilege

After reviewing the relevant communications *in camera*, the Court finds that the agency exception applies to the Liu Emails. First, Sun has established, and Geffen does not dispute, that Liu was acting as Sun's agent when communicating with Caldwell. (Liu Decl. ¶¶ 1, 4–5; Tr. at 24:15–19, 45:21–22). Liu's declaration further establishes that he understood that all his communications with Caldwell were "strictly confidential and privileged for the benefit of Mr. Sun." (Liu Decl. ¶ 5). Given Liu's history of communicating with Sun's lawyers on Sun's behalf (*see id.* ¶ 3), it may be inferred that Sun held a "reasonable expectation of confidentiality under the circumstances" sufficient to establish an agency relationship for purposes of the attorney-client privilege. *Osorio*, 75 N.Y.2d at 84.

Sun has also met his burden to show that Liu's presence was "necessary to

12

enable attorney-client communication" between Caldwell and Sun. *Spicer v. GardaWorld Consulting (UK) Ltd.*, 181 A.D.3d 413, 414, 120 N.Y.S.3d 34 (1st Dep't 2020) (citation omitted). Liu serves in "various capacities for multiple entities affiliated with" Sun, and as his representative in his "individual capacity for various matters." (Liu Decl. ¶ 1). Sun relies on Liu to "advise on [Sun's] business and legal affairs" and to "communicate with [Sun's] lawyers as his representative . . . so that counsel can render appropriate legal advice to [Sun]." (*Id.* ¶¶ 2–3). The Liu Emails themselves evidence Liu's familiarity with Sun's business affairs and Liu's role as an intermediary in interacting with Caldwell on Sun's behalf.

In similar circumstances, courts have concluded that an agent like Liu, who functions as the client's alter ego in dealing with counsel, is necessary to the rendition of legal services and that the agent's communications with counsel therefore fall within the attorney-client privilege. *See, e.g.*, *Pampena v. Musk*, No. 22-CV-05937-CRB (DMR), 2025 WL 2224423, at *5 (N.D. Cal. Aug. 5, 2025) (finding that attorney-client privilege protected communications between Elon Musk's attorney and Musk's employee who served as the head of Musk's family office, Musk's representative in merger transaction in question, and "his agent when Musk was not handling the matter personally"); *Sec. & Exch. Comm'n v. Wyly*, No. 10 Civ. 5760 (SAS), 2011 WL 3366491, at *2, *5 (S.D.N.Y. July 27, 2011) (Special Master's opinion) (finding that individuals who worked for Sam and Charles Wyly's family business, including "the functional CFO for the Wylys," who "often exchanged information with counsel, as was necessary for counsel to properly represent the

13

Wylys," were "necessary agents" whose communications were protected by the privilege); *Matter of Est. of Weinberg*, 133 Misc. 2d 950, 952, 509 N.Y.S.2d 240 (Sur. Ct. N.Y. Cnty. 1986) (finding that attorney-client privilege attached to communications between a trustee's daughter and the trustee's attorney because daughter communicated in her capacity as trustee's agent, was an "officer, director and employee of his various business enterprises," and functioned as trustee's "alter ego" when communicating with attorney).

Further, having reviewed the documents *in camera*, the Court finds that the Liu Emails were primarily for the purpose of Caldwell providing legal advice in connection with the proposed transaction. The Court thus rejects Geffen's argument (*see* Dkt. No. 136 at 2 & n.3) that the communications merely involve the rendition of non-privileged business advice. *See, e.g.*, *Pearlstein*, 2019 WL 1259382, at \*19 (finding that "predominant purpose" of attorney email requesting specific information related to a customer communication strategy was to provide "the requested legal advice" and therefore was covered by the attorney-client privilege).

Accordingly, Sun has met his burden of sufficiently demonstrating that the agency exception attaches to the Liu Emails. *See Wyly*, 2011 WL 3366491, at \*2 (noting that the party invoking the agency privilege has the burden of showing that the privilege applies).

## C.  The Xiong Emails Are Not Protected by Attorney-Client Privilege

By contrast, the attorney-client privilege does not justify withholding the Xiong Emails—both because the agency privilege does not apply to Xiong's

communications with Caldwell and because, even if it did, Sun waived the privilege by producing other emails between Xiong and Caldwell.

## 1. The Agency Privilege Does Not Apply

The Court finds that Sun has not sustained his burden of demonstrating that the attorney-client privilege applies to the Xiong Emails. Communications between Sun's counsel and Xiong—a third party—are not privileged unless Sun shows that Xiong is "the party's or the attorney's agent," Sun had "a reasonable expectation of confidentiality" in the communications, and Xiong's participation in the communications was "necessary for the client to obtain informed legal advice." *Bulgari*, 649 F. Supp. 3d at 11–12 (internal quotations omitted).

As an initial matter, Sun has failed to show that Xiong was Sun's agent for purposes of the agency exception. At oral argument, Sun explicitly disclaimed Xiong's status as Sun's agent in communicating with Caldwell. (Tr. at 47:3–6). But if Xiong was not acting as Sun's agent when she communicated with Caldwell, then the agency privilege does not apply. *See In re Appl. Sveass*, 249 F.R.D. 96, 101 (S.D.N.Y. 2008) (rejecting application of agency privilege where record showed that, "for purposes of determining whether the attorney-client privilege applies, Levy cannot be considered to be an agent of Studio Capital").

Sun instead argues that Xiong derives her privileged status indirectly through Liu, who, according to Sun, was entitled to bring Xiong under the "tent" of the attorney-client privilege between Sun and Caldwell. (Tr. at 47:10–11, 51:25–52:2). But Sun cites no authority recognizing such a derivative theory of the agency

15

privilege, and such a theory is at odds with basic principles of both agency law and attorney-client privilege.

"[T]he attorney-client privilege 'belongs solely to the client[.]'" *In re Sound View Elite Ltd.*, No. 14 Civ. 8615 (GHW), 2015 WL 2166023, at *6 (S.D.N.Y. May 8, 2015) (quoting *In re von Bulow,* 828 F.2d 94, 100 (2d Cir. 1987)). Yet Sun himself— the sole owner of the privilege—submitted no affidavit on this motion substantiating that Xiong was his agent or representative. Nor does Liu claim in his declaration that he discussed or obtained approval from Sun to bring Xiong under the "tent" of the privilege. In fact, as Sun acknowledges, there is no evidence that he authorized Xiong to communicate with Caldwell on his behalf or even was aware that such communications were taking place. (Tr. at 45:4–10). Without any manifestation of assent by Sun, the principal, Xiong's emails with Caldwell cannot be viewed as those of an authorized agent. *See Consumer Fin. Prot. Bureau v. Sasson*, No. 24-554-CV, 2025 WL 1554514, at *2 (2d Cir. June 2, 2025) ("An agency relationship is formed when a principal 'manifests assent to an agent that the agent will act on the principal's behalf and be subject to the principal's control' with respect to a particular task, 'and the agent manifests assent to the same.'" (quoting *In re Nine West LBO Secs. Litig.*, 87 F.4th 130, 148 (2d Cir. 2023))).[2]

Beyond a failure to establish agency, Sun's privilege claim as to the Xiong

---

[2] For his part, despite Sun's concession to the contrary, Geffen insists that Xiong *was* Sun's agent. (Tr. at 73:5–10; Dkt. No. 119 at 2). That insistence is curious, since it would seem to undermine Geffen's position on this motion. Evidently, Geffen is so laser-focused on showing that Xiong acted at all times with Sun's blessing—an issue critical to the ultimate merits determination in this case— that he cannot bring himself to admit that Xiong, in any context, did not act as Sun's agent. Geffen overlooks, however, that Xiong could have been acting as Sun's agent for some purposes, such as the sale of *Le Nez* to Geffen, and not acting as Sun's agent for other purposes, such as communicating

16

Emails also fails to establish the two other key elements of an agency privilege claim. First, aside from Liu's conclusory statement that he "understood" that Xiong's communications with Caldwell would be kept confidential and privileged (Liu Decl. ¶ 6), Sun provides no facts indicating that Sun had a reasonable expectation of confidentiality in those communications or that he, Liu, or Caldwell took any steps to ensure such confidentiality. The Xiong Emails do not bear a "Privileged + Confidential" legend or any other manifestation of an intent to require Xiong to keep the communications confidential.[3] Nor is there any evidence that Xiong agreed to, or was instructed to, treat the communications as privileged and confidential. *See, e.g.*, *Stenovich v. Wachtell, Lipton, Rosen & Katz*, 195 Misc. 2d 99, 110, 756 N.Y.S.2d 367 (Sup. Ct. N.Y. Cnty. 2003) (party invoking privilege "fail[ed] to sufficiently establish that it had an expectation of confidentiality in the communications shared with third parties" concerning a corporate transaction where it "does not contend that it instructed these third parties not to disclose the subject communications to persons unrelated to" the client and counsel). Liu's

---

with Caldwell so that Caldwell could render legal advice to Sun. *See Sieger v. Zak*, 60 A.D.3d 661, 663, 874 N.Y.S.2d 535 (2d Dep't 2009) ("[T]o the extent that [third party involved in transaction at issue] could have been considered an agent of the corporation for certain purposes, he was not an agent for the purpose of making the subject communications [with counsel]."); *Schaeffer v. Transp. Media, Inc.*, 859 F.2d 1251, 1255 (7th Cir. 1988) ("It is well established that a person may be an agent for some purposes, but not for others." (citation omitted)). In finding that Sun has not shown that Xiong acted as his agent in her communications with Caldwell for purposes of the attorney-client privilege, the Court expresses no opinion on the larger issue of whether Xiong's actions in selling *Le Nez* to Geffen were authorized by or otherwise attributable to Sun.

[3] The Xiong Emails do contain a Loeb form confidentiality notice at the very bottom of the overall email chain. But this does not establish a reasonable expectation of confidentiality. *See, e.g.*, *Acosta v. Wilmington Tr., N.A.*, No. 17 Civ. 6325 (VSB) (KNF), 2019 WL 416329, at *5 (S.D.N.Y. Feb. 1, 2019) (rejecting as "baseless" a party's argument that "a boiler-plate disclaimer at the end of the e-mail communications at issue . . . shows that 'the communications at issue were confidential'").

17

subjective belief that the Xiong Emails would be kept confidential, in the absence of any affirmation from Sun himself or Caldwell or other supporting evidence, is insufficient to establish the requisite "*reasonable* expectation of confidentiality." *Nat'l Educ.*, 1999 WL 378337, at \*4 (emphasis in original); *cf. Bulgari*, 649 F. Supp. 3d at 13 (reasonable expectation of confidentiality demonstrated where, *inter alia*, client and third party "each agreed, as a condition of [third party's] participation in any attorney-client communications with [client's] attorneys, that [third party] would keep all such communications confidential").

In addition, Sun has failed to meet his burden of showing that Xiong's involvement was "necessary" for Sun to receive informed legal advice. *See Wyly*, 2011 WL 3366491, at \*2. According to Sun, Xiong was brought into the fold in her capacity as an "art adviser" and provided Caldwell with "details" about the proposed transaction with Geffen, and the context of that transaction, that Sun and Liu did not possess. (Liu Decl. ¶ 6; Tr. at 42:3–7, 42:20–43:9, 45:24–25). Up until the point Xiong stopped copying Liu and went "rogue," Xiong's role was to "help Liu communicate to Justin Sun's lawyers, and . . . to help Justin Sun's lawyers get what he needs to put the deal together." (Tr. at 40:18–41:19). Xiong was therefore "important and necessary to helping the lawyer understand how to paper this deal." (Tr. at 43:18–20). The Court's *in camera* review of the Xiong Emails confirms that Xiong primarily served to provide Caldwell with factual information concerning the terms of the proposed transaction and the transaction process.

This, however, is "insufficient to give rise to the privilege." *Ackert*, 169 F.3d

18

at 139.  In *Ackert,* corporate counsel for Paramount Corporation communicated with a third party investment banker, who had proposed the transaction at issue, "to learn more about the details of the proposed transaction . . . so that he could advise his client . . . about the legal and financial implications of the transaction."  *Id.* at 138.  The Second Circuit overturned the lower court's finding that the communications were privileged, holding that "a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client."  *Id.* at 139.  Thus, the privilege claim was rejected, "notwithstanding [the Second Circuit's] assumption that th[e] conversations [between the investment banker and counsel] significantly assisted the attorney in giving his client legal advice about its tax situation."  *Id.*  That same reasoning dooms Sun's privilege claim as to the Xiong Emails.

Numerous courts have rejected similar privilege claims under the agency exception, finding that the third party's involvement was merely "useful" rather than "indispensable" or "necessary" to facilitating the attorney's advice.  *In re Appl. Sveass,* 249 F.R.D. at 99, 101 (finding that communications between counsel and third party art broker involved in sale of sculpture purchased by counsel's client were not privileged where, "[a]t best, [the art broker] may have provided some help to [counsel] in clarifying certain factual issues surrounding the sale of 'Miss Pogany' that had legal implications"); *see also, e.g., Narayanan,* 285 F. Supp. 3d at 612–13 (finding that "[t]he reasoning of *Ackert* compels" denial of privilege claim where

19

valuation consultant "provided [counsel] with the facts necessary for [counsel] to provide legal advice to [his client]"; "although it may have been helpful or convenient to [counsel] to speak directly to [the consultant], the record does not prove that [counsel] *needed* [the consultant] to interpret the information for it" (emphasis in original)); *Green v. Beer*, No. 06 Civ. 4156 (KMW) (JCF), 2010 WL 3422723, at *4 (S.D.N.Y. Aug. 24, 2010) (rejecting privilege claim where plaintiffs "failed to establish that the sharing of the documents with [their financial advisor] was necessary, let alone nearly indispensable, to the provision of legal advice" or that the financial advisor "served some specialized purpose in facilitating the attorney-client communication and the provision of proper legal advice" (cleaned up)); *Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 Civ. 6143 (DLC), 2010 WL 343490, at *2 (S.D.N.Y. Feb. 1, 2010) ("[T]o the extent that plaintiffs included Blackwell because of his knowledge of the facts, this is insufficient to bring him within the purview of the attorney-client privilege."); Thomas E. Spahn, *Business Lawyers: Listen Up! Attorney-client Privilege isn't just for Trial Lawyers*, 14-JUN Bus. L. Today 10, 12 (2005) ("[T]he vast majority of courts find that communications made in the presence of . . . client advisers do *not* deserve privilege protection, and that sharing privileged communications with them waives the protection." (emphasis in original)).

Sun's position at oral argument that Xiong could be "liken[ed] to" a "consulting expert to attorneys" (Tr. at 40:7–9; *see also id.* at 43:22) is equally unavailing. Normally such a contention would sound in the *Kovel* doctrine. At oral

20

argument, however, Sun's counsel explicitly disavowed reliance on a "*Kovel* or *Kovel*-like privilege." (Tr. at 50:8–10, 19–21 ). *Kovel* itself, counsel explained, was inapplicable because in a *Kovel* situation, "[t]he attorney has gone out and asked for help," whereas here, it was Liu, not Caldwell, who sought out Xiong's assistance. (*Id.* at 50:22–51:2). Instead, counsel explained he was merely drawing an "analogy" to *Kovel.* (*Id.* at 43:22, 50:12).

*Kovel* does not support Sun's privilege claim here, either directly or by analogy. *Ackert* is again instructive. There, the Second Circuit also found that the communications between the investment banker and Paramount's corporate counsel were not privileged under *Kovel* because Paramount's attorney was not relying on the banker to "translate or interpret information" given to the attorney by his client. *Ackert*, 169 F. 3d at 139. Rather, Paramount's counsel sought out the banker for "information Paramount did not have" about a proposed transaction. *Id.* at 139–40. Because the investment banker's role "was not as a translator or interpreter of client communications, the principle of *Kovel* [did] not shield his discussions with" Paramount's counsel. *Id.* at 140.

*Ackert's* reasoning applies here. As noted, Xiong's essential role was to provide Caldwell with factual information about the transaction and the transaction process. The Court's *in camera* review of the Xiong Emails refutes Sun's claim that Xiong was, in any significant way, imparting specialized knowledge in her capacity as an art expert that was necessary for Caldwell to render effective legal advice—let alone acting as "a translator or interpreter of client communications." *Ackert*, 169

21

F.3d at 140.  The *Kovel* principle thus "does not shield [Xiong's] discussions with [Caldwell]."  *Id.*

For these reasons, the Court thus concludes that Sun has failed to meet his burden of demonstrating that the agency privilege shields the Xiong Emails.

### 2.  Any Privilege Has Been Waived

Even if the agency privilege did attach to the Xiong Emails, the Xiong Emails still would not be protected because Sun waived the privilege by producing the subsequent emails between Xiong and Caldwell dated from January 15 to January 17, 2024.

Sun contends that there was no waiver because there is a "principled basis" for Loeb to have produced the January 15–17, 2024 emails between Xiong and Caldwell while withholding the earlier emails between the two.  (Dkt. No. 127 at 3).  Specifically, Sun argues that Xiong went "rogue" between January 2, 2024—the date of the last Xiong Email withheld from production—and January 15, 2024.  (*Id.*).  In support of that argument, Sun notes that beginning on January 15, 2024, Xiong stopped copying Liu on her emails with Caldwell.  (*Id.*).  Sun further claims that Xiong's emails with Caldwell after that point included "fraudulent messages" that "misled Caldwell into thinking that Sun had agreed to an entirely different deal structure."  (*Id.* at 2,3).  Once Xiong began engaging in "rogue and fraudulent activities," Sun reasons, she was not acting on his behalf and her communications with Caldwell could no longer be deemed privileged.  (*Id.* at 2).

Sun's argument thus hinges on the assertion that Xiong went "rogue"

between January 2 and January 15, 2024. The record, however, provides no support for that assertion. The first email on which Xiong stopped copying Liu—a 9:53 am, January 15, 2024 email from Xiong to Caldwell—is a report by Xiong on a call she had with Geffen's team earlier that day. (Dkt. 119 Ex. 2 at 5 (LOEB_0000119–20)). In the email, Xiong explained that Geffen's team raised a question concerning a lien search that revealed a lien in California against a company called "Sunshine Vision Inc." that also named Sun as a second debtor; she asked Caldwell if he thought the lien would affect the deal. (*Id.*). At oral argument, Sun could not identify any false information in the 9:53 am email. (Tr. at 63:20–64:3). Nor could Sun offer any plausible reason to believe that the 9:53 am email marks the dividing line between Xiong acting in Sun's interests and her going rogue, or that Xiong would have had a nefarious motive to exclude Liu from the email. (*See id.* at 63:16–64:23).

Sun instead claims that it was in a subsequent email on January 15, 2024, at 10:11 am, that Xiong misled Caldwell, falsely telling him that APENFT owned *Le Nez*, when Xiong knew that the sculpture was in fact owned by Sun, not APENFT. (Dkt. No. 119 Ex. 2 at 4 (LOEB_0000118–19); Tr. at 65:4–11). But Xiong did not volunteer that information to Caldwell; she simply responded to Caldwell's question, set forth in an email replying to Xiong's 9:53 am email, asking her if Sunshine Vision "own[s] the Giacometti?" (Dkt. No. 119 Ex. 2 at 4 (LOEB_0000119)). There is no reason to think that Xiong could have anticipated Caldwell would ask her that question, or that her decision to drop Liu from her 9:53

23

am email was part of some elaborate strategy to leave her alone with Caldwell on the email chain so that she could begin misrepresenting facts. Sun offers no facts to support such a theory—only speculation. (*See* Tr. at 66:10–14 (suggesting that Xiong's 9:53 am email "could have been the bait" for Xiong to start deceiving Caldwell)).

More importantly, the Court's *in camera* review of the Xiong Emails does not support Sun's claim that Xiong's emails to Caldwell from January 15–17, 2024 (on which Liu was not copied) described the potential Geffen deal in a manner that was inconsistent with the description of the deal in the withheld Xiong Emails (on which Liu was copied). Notably, Caldwell did not indicate in the January 15–17, 2024 emails that Xiong was saying anything different or out of the ordinary. Simply put, in the Court's view, a comparison of the Xiong Emails with the January 15–17, 2024 emails does not show that Xiong was acting on Sun's behalf any more or less in one set than in the other.

In sum, Sun has failed to provide any factual basis to support his assertion that Xiong went "rogue" in between the Xiong Emails from December 22, 2023 to January 2, 2024 and her emails with Caldwell from January 15–17, 2024. As a result, Sun falls short of demonstrating a principled basis for his decision to produce the latter emails while withholding the former emails. This finding leads the Court to two alternative conclusions, each of which is fatal to Sun's privilege claim.

First, if, as Sun contends on this motion, Xiong fell within the scope of the agency privilege at the time of the pre-January 15, 2024 Xiong Emails, and if her

24

status did not change during her email communications with Caldwell from January 15–17, 2024, then those subsequent communications were equally privileged. Sun therefore waived privilege by producing the January 15–17, 2024 emails. Those emails relate to the same subject matter as the Xiong Emails (and indeed are part of the same email chain). This would mean that Sun waived privilege through intentional and selective disclosure of some, but not all, of the conversations between Xiong and Caldwell concerning *Le Nez*. It would be unfair and misleading to allow Sun to disclose privileged emails that he believes aid his litigation position that Xiong acted without Sun's authorization in selling *Le Nez*, while simultaneously shielding disclosure of her other emails with Caldwell. *See Pearlstein*, 2019 WL 1259382, at *7 (noting that selective disclosure typically leads to a finding of waiver "as to all documents pertaining to the subject disclosed"); Fed. R. Evid. 502(a), Advisory Notes ("Under [Rule 502(a)], a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation.").[4]

Alternatively, if Xiong had already gone rogue by December 22, 2023, when the Xiong Emails begin, then she also was not acting in Sun's interests during the

---

[4] The scope of this waiver is limited to Xiong's communications with Caldwell and should not be construed to waive Sun's privilege as to all privileged communications concerning *Le Nez*. In particular, the Court finds that the scope of the waiver does not include the separate communications between Caldwell and Liu (*i.e.*, the Liu Emails), because the relevant subject matter is what *Xiong* communicated to Caldwell about the transaction. *See Regeneron Pharms., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 589 (S.D.N.Y. 2015) ("As subject matter waiver seeks to readjust the essential unfairness in disclosing part, but not all, of an attorney-client communication, the required remedy should be addressed to that particular unfairness." (internal citation omitted)), *aff'd sub nom. Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343 (Fed. Cir. 2017); *Seyler v. T-Sys. N. Am., Inc.*, 771 F. Supp. 2d 284, 288 (S.D.N.Y. 2011) (explaining that the scope of the intentional waiver provision under Fed. R. Evid. 502(a) is "narrow").

time of the Xiong Emails.  That would mean, based on Sun's own logic, that none of the Xiong Emails would be privileged, as the agency privilege would not apply to them.  (*See* Dkt. No. 127 at 3 (acknowledging that if Xiong was not acting on Sun's behalf, Xiong's communications with Caldwell "could no longer be deemed covered by an agency privilege")).  That analysis would lead to the same result: the Xiong Emails must be produced.

In summary, Loeb must produce the Xiong Emails because Sun has failed to satisfy his burden of showing that the Xiong Emails are privileged in the first instance and, alternatively, has failed to satisfy his burden of showing that he did not waive privilege with respect to those emails.  Sun has, however, met his burden of showing that the Liu Emails are privileged and that he has not waived privilege with regard to those emails.  The Liu Emails, therefore, need not be produced.

## CONCLUSION

For the reasons stated above, Geffen's motion to compel production of documents withheld on the basis of the attorney-client privilege is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

DATED:    New York, New York
          June 25, 2026

_____
GARY STEIN
United States Magistrate Judge

26